[Cite as *State ex rel. Miller v. Ohio State Hwy. Patrol*, 2014-Ohio-2244.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


| | | |
|---|---|---|
| STATE OF OHIO EX REL. MARK W. MILLER, | : | |
| | : | CASE NO.  CA2012-05-034 |
| Relator, | : | D E C I S I O N |
| | : | 5/27/2014 |
| - vs - | : | |
| | : | |
| OHIO STATE HIGHWAY PATROL, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |


ORIGINAL ACTION IN MANDAMUS


Finney Law Firm LLC, Christopher P. Finney, 4270 Ivy Pointe Blvd., Suite 225, Cincinnati, Ohio 45245 and Curt C. Hartman, 3749 Fox Point Ct., Amelia, Ohio 45102, for relator

Michael DeWine, Ohio Attorney General, Morgan A. Linn, Jeffery W. Clark, c/o Ohio State Highway Patrol, 1970 West Broad Street, 5th Floor, Columbus, Ohio 43223, for respondents, Ohio State Highway Patrol and Jeff Maute


**Per Curiam.**

{¶ 1} The current case is before this court pursuant to a complaint brought by relator, Mark Miller, seeking statutory damages, court costs, and attorney fees from respondent, the Ohio State Highway Patrol. Relator claims entitlement to damages, costs, and fees for what he alleges was respondent's unlawful denial of certain requested public records.

## I. Statement of Facts

{¶ 2}   According to his complaint, Mark Miller is a founding member and treasurer of the Coalition Opposed to Additional Spending and Taxes (COAST).   COAST opposes excessive taxes and government spending, and also involves itself in exposing alleged abuse of government power.   COAST works to learn of, document, and expose policies, practices, and procedures of government officials that exceed the government entity's statutory and constitutional authority.   In order to further COAST's goals, Miller often makes public records requests in an effort to bring to light such government waste, fraud, or abuse.

{¶ 3}   In September 2011, Miller requested, via certified mail, certain public records from the Ohio State Highway Patrol regarding Trooper Joseph Westhoven's investigations of traffic-related incidents.   As pertinent to this case, one such traffic-related incident involved Trooper Westhoven's investigation of Ashely Ruberg for a suspected operation of a vehicle under the influence of alcohol (OVI).

{¶ 4}   Trooper Westhoven first became suspicious that Ruberg was driving under the influence when he performed a traffic stop, which he initiated because Ruberg was driving 72 m.p.h. in a zone with a maximum speed of 45 m.p.h.   Upon speaking with Ruberg, Trooper Westhoven noticed that Ruberg's eyes were red and that there was an odor of an alcoholic beverage coming from her car.   Ruberg performed field sobriety tests, some of which indicated that she was under the influence.   Ruberg also submitted to a Breathalyzer test, which revealed that her blood alcohol level was .116.   Ruberg was arrested, and charged with OVI.  Miller then requested the records specific to Trooper Westhoven's investigation of Ruberg's OVI.

{¶ 5}   While the Highway Patrol produced most of the documents Miller requested, it withheld two categories of records, including (1) any and all video and audio recordings from the police cruiser operated by Trooper Westhoven from the beginning of his shift on June 1,

2011 through the end of his shift on August 5, 2011, and (2) any and all Impaired Driver Reports drafted and/or printed by Trooper Westhoven, relating to any arrests made for OVI between June 1, 2011 and August 5, 2011, including, but not limited to, narrations on statements of facts, field sobriety test reports, and evaluations.

{¶ 6} More specifically, the Highway Patrol did not give Miller (1) a portion of the video from Trooper Westhoven's police cruiser that documented the traffic stop, detention, and arrest of Ruberg for OVI, or (2) the impaired driver report relating to Ruberg's arrest. The Highway Patrol informed Miller that it was not producing the requested documents because the records constituted investigative work product for the ongoing criminal investigation of Ruberg. In response to the Highway Patrols' nonproduction, Miller filed a mandamus action in this court on May 10, 2012.

{¶ 7} This court dismissed Miller's mandamus complaint, finding that Miller had not established by clear and convincing evidence that the Highway Patrol failed to turn over records according to the Public Records Act. *State ex rel. Miller v. Ohio State Hwy. Patrol*, 12th Dist. Clermont No. CA2012-05-034. Miller appealed to the Ohio Supreme Court, and argued that he was entitled to mandamus relief. The Ohio Supreme Court reversed the judgment of this court, finding that the Highway Patrol had failed to turn over two records that had been requested by Miller. *State ex rel. Miller v. Ohio State Highway Patrol*, 136 Ohio St.3d 350, 2013-Ohio-3720. While the court determined that the Highway Patrol had not fulfilled Miller's entire request, the court did not reach a conclusion as to whether the Highway Patrol was statutorily obligated to actually produce the records.

{¶ 8} On remand, this court was ordered to review the withheld records and to determine whether they fall within the "confidential law enforcement investigatory record" exception to the Public Records Act, and specifically whether fulfilling Miller's request of the withheld records would create a "high probability of disclosure" of "specific investigatory work

- 3 -

product" as asserted by the Highway Patrol.

{¶ 9} During the litigation of Miller's mandamus claim before the Ohio Supreme Court and upon remand to this court, the criminal case against Ruberg was completed, and the Highway Patrol released the withheld records to Miller. While Miller's mandamus claim is now moot, as all of his requested documents have been given to him, he now requests that he be awarded statutory fees, court costs, and attorney fees for what he argues was the Highway Patrol's violation of the Public Records Act

## II. Ohio Public Records Act

{¶ 10} "The Public Records Act reflects the state's policy that 'open government serves the public interest and our democratic system.'" *State ex rel. Morgan v. City of New Lexington*, 112 Ohio St.3d 33, 2006-Ohio-6365, ¶ 28, quoting *State ex rel. Dann v. Taft*, 109 Ohio St.3d 364, 2006-Ohio-1825, ¶ 20. Courts construe Ohio's Public Records Act liberally in favor of broad access, with any doubt resolved in favor of disclosure of public records. *Id.*

{¶ 11} According to R.C. 149.43(B)(1),

> Upon request and subject to division (B)(8) of this section, all public records responsive to the request shall be promptly prepared and made available for inspection to any person at all reasonable times during regular business hours. Subject to division (B)(8) of this section, upon request, a public office or person responsible for public records shall make copies of the requested public record available at cost and within a reasonable period of time.

{¶ 12} R.C. 149.43(C)(1) sets forth the proposition that an aggrieved party may pursue a mandamus action and be entitled to statutory damages upon a public entity's failure to provide public records in accordance with the statute. "[I]n general, providing the requested records to the relator in a public-records mandamus case renders the mandamus claim moot." *State ex rel. Toledo Blade Co. v. Seneca Cty. Bd. of Commrs.,* 120 Ohio St.3d 372, 2008-Ohio-6253, ¶ 43. However, the production of requested documents does not,

according to the Public Records Act, moot a claim for damages. *State ex rel. Cincinnati Enquirer v. Heath*, 121 Ohio St.3d 165, 2009-Ohio-590, ¶ 18. Even so, a party is only entitled to damages if the petitioner first demonstrates that the respondent failed to provide the records in accordance with R.C. 149.43(B)(1). *State ex rel. Patton v. Rhodes*, 129 Ohio St.3d 182, 2011-Ohio-3093, ¶ 21; R.C. 149.43(C)(1).

{¶ 13} A public records custodian has the burden to establish the applicability of an exception to the Public Records Act, and courts strictly construe such exceptions against the custodian. *State ex rel Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770. The exception claimed by the Highway Patrol is codified at R.C. 149.43(A)(1)(h), which excludes "confidential law enforcement investigatory records" from the definition of "public record." As pertinent to the current matter, R.C. 149.43(A)(2) defines a "confidential law enforcement investigatory record" as

> any record that pertains to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure of any of the following:
>
> * * *
>
> (c) Specific confidential investigatory techniques or procedures or specific investigatory work product.

{¶ 14} The Ohio Supreme Court has established a two-part test to determine whether a particular record is a confidential law enforcement investigatory record as anticipated within the Public Records Act. "First, is the record a confidential law enforcement record? Second, would release of the record 'create a high probability of disclosure' of any one of the four kinds of information specified in R.C. 149.43(A)(2)?'" *State ex rel. Musial v. N. Olmsted*, 106 Ohio St.3d 459, 2005-Ohio-5521, ¶19, quoting *State ex rel. Beacon Journal Publishing Co. v.*

*Maurer*, 91 Ohio St.3d 54 (2001).[1]

{¶ 15} "The phrase 'law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature' refers directly to the enforcement of the law." *State ex rel. Multimedia, Inc. v. Snowden*, 72 Ohio St.3d 141, 143 (1995). The statutory definition is met when the records are compiled in order to investigate specific alleged misconduct of matters prohibited by state law. *State ex rel. Polovischak v. Mayfield*, 50 Ohio St.3d 51 (1990).

{¶ 16} Specific investigatory work product consists of "any notes, working papers, memoranda or similar materials, prepared by attorneys or law enforcement officials in anticipation of litigation." *State ex rel. Leonard v. White*, 75 Ohio St.3d 516, 518 (1996). "To be considered work product * * * a record must have been assembled in connection with an actual pending or highly probable criminal prosecution." *State ex rel. The Toledo Blade Co., v. Toledo*, 6th Dist. Lucas No. L-12-1183, 2013-Ohio-3094, ¶ 12, citing *State ex rel. Police Officers for Equal Rights v. Lashutka*, 72 Ohio St.3d 185 (1995). A criminal proceeding is probable or highly probable "as long as it is clear that a crime has in fact been committed." *Leonard* at 518.

{¶ 17} Specific investigatory work products, however, do not include "ongoing routine offense and incident reports" because "incident reports initiate the criminal investigation; they are not part of it." *Beacon Journal*, 91 Ohio St.3d at 57. For example, 911 recordings do not constitute special investigatory work product because such calls are not prepared by attorneys or other law enforcement officials, are routinely recorded without any specific investigatory purpose in mind, and because the calls generally precede any forms or reports completed by the police during their investigation. *State ex rel. Cincinnati Enquirer v.*

---

1. The only "kind of information" specified in R.C. 149.43(A)(2) that is applicable to the case at bar is subsection (c), whether there is a high probability of disclosing specific confidential investigatory techniques or procedures or specific investigatory work product.

*Hamilton Cty.*, 75 Ohio St.3d 374 (1996).

### III. Withheld Records

{¶ 18} As previously stated, the Highway Patrol turned over several documents to fulfill Miller's public records request. However, the Highway Patrol claimed that the statutory exception permitted its nonproduction of (1) a portion of the video that documented the traffic stop, detention, and arrest of Ruberg, and (2) the impaired driver report relating to Ruberg's arrest.

{¶ 19} Therefore, in order for the Highway Patrol to demonstrate that the claimed exception applies, it must establish that the withheld records pertain to a law enforcement matter of criminal, quasi-criminal, civil, or administrative nature whose release would create a high probability of disclosure of specific investigatory work product

### A. Cruiser Cam Video

{¶ 20} Miller requested, but was denied, portions of a video recorded on Trooper Westhoven's cruiser camera that documented the traffic stop, detention, and arrest of Ashley Ruberg for OVI.

{¶ 21} Regarding the two-part test, the video satisfies the first prong because it is a record that pertains to the enforcement of R.C. 4511.19, Ohio's statute that prohibits driving under the influence of alcohol. The Highway Patrol has the authority to investigate and enforce Ohio laws regarding the operation of vehicles on the highways, including laws that prohibit OVI. R.C. 5503.02. The cruiser camera video recorded the investigation of a specific alleged violation of Ohio law, rather than a routine monitoring investigation of all motorists on the road the night Ruberg was arrested. In fact, the video was specifically generated by Trooper Westhoven's investigation of Ruberg's alleged OVI, and the cruiser camera recorded the investigation he performed given his suspicion that Ruberg was violating Ohio law by driving under the influence of alcohol. Therefore, the video is a

confidential law enforcement record.

{¶ 22} Regarding the second prong of the two-part test, the release of the video prior to the completion of the criminal case against Ruberg would have created a high probability of disclosure of a specific investigatory work product. Stated once more, specific investigatory work product consists of information or materials assembled by law enforcement officials in connection with a probable or pending criminal proceeding.

{¶ 23} The record is clear that the cruiser camera captured Trooper Westhoven's investigation specific to whether Ruberg was driving under the influence of alcohol. The investigation included Trooper Westhoven interacting with Ruberg, having her exit her vehicle, and having her perform field sobriety tests. The video, therefore, revealed the particular investigative techniques employed by Trooper Westhoven to assess whether Ruberg was driving while intoxicated, and demonstrated from what source Trooper Westhoven drew his conclusions that Ruberg had committed an OVI offense. *See State ex rel. Toledo Blade Co.*, 2013-Ohio-3094 (finding a map of gang activity was not investigatory work product because nothing on the map reflected particular investigative techniques used to gather information, and where the map itself did not reveal the source for information used in the investigation of gang-related activity).

{¶ 24} The video captured Trooper Westhoven's specific assessment of whether he had probable cause to arrest Ruberg for OVI. There is no doubt that the video depiction was intended to be used by Trooper Westhoven to justify his probable cause determination, and by the state to support the impending criminal case against Ruberg.

{¶ 25} Unlike a 911 call or an incident report, the cruiser camera recorded Trooper Westhoven's pursuit of Ruberg for what he observed was a violation of Ohio's traffic laws. Trooper Westhoven's investigation was not instituted by the requested video, but rather, was created directly by Trooper Westhoven to preserve a crucial aspect of his investigation and

information-gathering specific to a probable violation of Ohio law. The video constitutes materials assembled by Trooper Westhoven in connection with his investigation of that violation, and the video was recorded for its use in any future criminal proceeding against Ruberg.

{¶ 26} As such, we find that the video recording taken by Trooper Westhoven's cruiser camera constituted a confidential law enforcement investigatory record, made exempt from production pursuant to the Ohio Public Records Act.

**B. The Impaired Driver Report Relating to Ruberg's Arrest**

{¶ 27} Miller also requested production of the impaired driver report that Trooper Westhoven created specific to Ruberg's arrest.

{¶ 28} The impaired driver report satisfies the first prong of the confidential law enforcement investigatory record test because it is a record that pertains to the enforcement of an Ohio statute that prohibits driving under the influence of alcohol. Specifically, the form chronicled the various reasons supporting Trooper Westhoven's conclusion that Ruberg was driving under the influence at the time he performed the traffic stop. The details included on the report included the results from the field sobriety tests, as well as the initial results of the portable breath test, which indicated that Ruberg's level of intoxication exceeded the legal limit. Therefore, the report fulfilled the statutory definition of a confidential law enforcement record.

{¶ 29} Regarding the second prong, the record indicates that the release of the impaired driver report prior to the completion of the criminal case against Ruberg would have created a high probability of disclosure of a specific investigatory work product.

{¶ 30} The record is clear that the impaired driver report detailed Trooper Westhoven's investigation specific to whether Ruberg was driving under the influence of alcohol. The report includes Trooper Westhoven's recollection of the conditions and relevant

circumstances on the night he arrested Ruberg, including that she smelled of an alcoholic beverage. The report also details the results of the field sobriety tests administered by Trooper Westhoven, including in what ways Ruberg's behavior and performance on the field sobriety tests were indicative of her being under the influence. The impaired driver report would certainly be used by the state in its attempt to demonstrate that Trooper Westhoven had probable cause to arrest Ruberg for OVI, and by the state to support any impending criminal case against her.

{¶ 31} Similar to the cruiser camera video, and unlike a 911 call or an incident report, Trooper Westhoven did not complete the impaired driver report as a means to initiate the investigation, but rather generated the report in an effort to record crucial details of his investigation. The impaired driver report contained Trooper Westhoven's own observations, conclusions, and interpretation of the circumstances on the night of the incident, rather than a simple recordation of what a third party told him in order to initiate the investigation. Accordingly, the impaired driver report constitutes materials assembled by Trooper Westhoven in connection with his investigation of Ruberg's possible OVI.

{¶ 32} As such, we find that the impaired driver report constituted a confidential law enforcement investigatory record, made exempt from production pursuant to the Ohio Public Records Act.

## IV. Conclusion

{¶ 33} In this case of first impression, we find that the cruiser camera video and impaired driver report are excluded from the definition of public records because the Highway Patrol has demonstrated that the records fall squarely within the statutory confidential law enforcement investigatory record exception. This is especially true where neither of the requested records initiated the criminal investigation but was instead created to record the personal observations of Trooper Westhoven and his subjective experience of investigating

the alleged OVI.

{¶ 34} In so holding, this court is aware that the Ohio Supreme Court made passing reference to OVI records as not being work product in *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420 (1994). Therein, the court defined "work product" by adopting the definition set forth in Black's Law Dictionary, and stated that work product "does not include ongoing routine offense and incident reports, including but not limited to, records relating to a charge of driving while under the influence and records containing the results of intoxilyzer tests." *Id.* at paragraph 5 of the syllabus. However, we do find this statement dispositive of Miller's current public records request.

{¶ 35} The court's analysis in *Steckman* did not specifically address the issue of whether OVI-related records were exempt from the "work product" exclusion. Rather, the court's focus was on charges of aggravated murder, aggravated robbery, attempted murder, and kidnapping. While the court made a reference to OVI-related records, it did not offer any reasoning or analysis as to why records related to OVI investigations would be excluded from the statutory definition of "work product."

{¶ 36} *Steckman* was decided in 1994. In the subsequent 20 years, police officers have changed the way they investigate crimes, and technology has progressed in such a manner that cruiser cameras and other advances have become commonplace in criminal investigations. We are therefore presented with an opportunity, and in fact a directive from the Ohio Supreme Court, to determine whether such records are public records under Ohio's Public Records Act. Despite *Steckman's* passing reference to OVI records as not constituting work product, we have performed the full analysis according to Ohio's Public Records Act and relevant case law, and have determined that the two specific records in the case at bar fall within the statutory exception.

{¶ 37} When this court, or any other, reviews the constitutionality of a traffic stop, we

refer to the officer as making an *investigatory* stop. Such a classification is accurate because before an officer can make a probable cause determination that fulfills constitutional requirements, that officer must investigate, make observations, and reach certain conclusions. Officers are then required to recollect every detail of their investigation, and their recollection and testimony are challenged by the rigors of both direct and cross-examination. Certainly, the records created during an investigation which document the officer's suspicion of an offense, details discovered by the officer during the investigation, and facts gathered during the officer's active investigation of the alleged crime remain investigatory work product until the completion of the criminal proceedings.

{¶ 38} The cruiser camera video and the impaired driver report were both prepared by and on behalf of law enforcement officials, with specific investigatory purposes in mind. Unlike 911 calls or reports detailing other people's observations leading to the initiation of a criminal investigation, the withheld records in the case sub judice document the criminal investigation triggered by the trooper's own suspicion of a violation of Ohio law. Trooper Westhoven, who is a trained member of law enforcement, collected, analyzed, and investigated the facts and circumstances of the alleged OVI, and journalized his personal and active investigation so that the information contained therein could be used in a future criminal case against Ruberg. As such, these specific records are dissimilar to routine incident/offense reports or 911 calls.

{¶ 39} Having found that the Highway Patrol properly refused production of the two requests because of the confidential law enforcement investigatory record exception to the Public Records Act, we find no violation of the statute. As such, Miller is not entitled to a writ of mandamus, or statutory damages, court costs, or attorney fees.

HENDRICKSON, P.J., PIPER and M. POWELL, JJ., concur.