[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cincinnati Enquirer v. Ohio Dept. of Pub. Safety,* Slip Opinion No. 2016-Ohio-7987.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-7987

THE STATE OF OHIO EX REL. CINCINNATI ENQUIRER *v.* OHIO DEPARTMENT OF PUBLIC SAFETY ET AL.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Cincinnati Enquirer v. Ohio Dept. of Pub. Safety,* Slip Opinion No. 2016-Ohio-7987.]

*Mandamus—Public Records Act—R.C. 149.43—Writ of mandamus sought to compel Ohio Department of Public Safety to disclose recordings from cameras mounted on the dashboards of State Highway Patrol cruisers— Investigative work-product exception—Claim capable or repetition yet evading review—Case-by-case review required to determine whether dash-cam recordings must be disclosed—Request for attorney fees, statutory damages, and costs denied.*

(No. 2015-0390—Submitted June 14, 2016—Decided December 6, 2016.)

IN MANDAMUS.

_____

**FRENCH, J.**

{¶ 1} Relator, the Cincinnati Enquirer ("Enquirer"), filed this original action in mandamus seeking the disclosure of recordings from cameras mounted on the dashboards ("dash-cams") of two Ohio State Highway Patrol ("OSHP") cars. Nearly two months later, respondents, the Ohio Department of Public Safety ("ODPS") and its director John Born, released the requested recordings. Based on our review of the recordings, we hold that the Public Records Act, R.C. 149.43, allowed ODPS to redact investigatory work product from one recording, but otherwise required ODPS to release the remainder.

{¶ 2} We deny, however, the Enquirer's request for attorney fees, statutory damages, and court costs.

## FACTS AND PROCEDURAL HISTORY

{¶ 3} The recordings at issue pertain to a January 22, 2015 pursuit on Interstate 71 involving OSHP Troopers Laura Harvey and Cristian Perrin. OSHP is a division of ODPS. R.C. 5503.01. The pursuit began in Warren County, Ohio, shortly after 8:30 a.m. That morning, Harvey was on duty in her patrol car when she received a dispatcher's radio call relaying a citizen's report of a maroon Ford Fusion traveling south on Interstate 71 without a rear license plate and swerving off the roadway. Harvey waited south of the last known location of the car. She attempted to stop the driver by pulling her patrol car behind the suspect and turning on her emergency lights and siren. The suspect did not stop or pull over. Perrin and officers from other law-enforcement agencies later joined the pursuit.

{¶ 4} The pursuit ended in Hamilton County about 8:50 a.m. after the suspect, Aaron Teofilo, crashed into a guardrail. Teofilo was arrested and charged with multiple felonies.

### The dash-cam recordings

{¶ 5} The activation of the emergency lights automatically triggered the dash-cams in both Harvey's and Perrin's cars to start recording their pursuit of

Teofilo. Pursuant to OSHP's in-car camera policy, officers are expected to record traffic stops, pursuits, and other public contacts occurring within the operating range of the camera.

{¶ 6} The dash-cams generated three recordings of the pursuit: one from Harvey's car and two from Perrin's car. We briefly summarize the contents of those recordings here.

*The first recording*

{¶ 7} Harvey's recording begins about 8:30 a.m. and ends about 9:30 a.m. Along with video footage of the pursuit, the recording also includes audio of Harvey's voice, as well as radio communications from other officers and the dispatchers. Throughout the pursuit, Harvey reports her location and verbally notes traffic violations by Teofilo, including driving outside the marked lines and changing lanes without signaling. At 8:41 a.m., Perrin's patrol car joins the pursuit and pulls up along the right side of Teofilo's car. Both Harvey and Perrin initially report light traffic and estimated speeds of 55 to 69 m.p.h. As the pursuit gets closer to the city limits of Cincinnati, the command post advises that stop sticks will be deployed near exit 12.

{¶ 8} About 8:46 a.m., Teofilo avoids the stop sticks and then accelerates down the interstate reportedly at speeds of 90 to 120 m.p.h. For approximately four minutes, Teofilo disappears from the view of Harvey's dash-cam. Other law-enforcement agencies pursue Teofilo as Harvey backs off to protect the perimeter around the pursuit.

{¶ 9} Teofilo crashes and stops on the left side of the interstate. At 8:51 a.m., Harvey stops behind Teofilo's crashed car. Another patrol car is parked in front of Harvey's car and blocks Harvey's dash-cam. The officers order Teofilo out of the car, and Harvey can then be heard, but not seen, instructing Teofilo to put his hands behind his back. Harvey then asks Teofilo whether he has any

weapons and why he is covered in blood. (Teofilo sustained lacerations to his face from the crash.)

{¶ 10} Harvey seats the handcuffed Teofilo in the back of her car, outside the view of the dash-cam, and begins to question him. Teofilo tells Harvey that he is trying to get to Alabama and that he stole the Ford Fusion.

{¶ 11} Harvey briefly leaves Teofilo in her patrol car. At 8:56 a.m., Harvey returns to her car, reads Teofilo his *Miranda* rights, and questions Teofilo again. Harvey also asks Teofilo whether he has hepatitis or any other blood-borne diseases.

{¶ 12} During Harvey's second questioning of Teofilo, the car in front of Harvey's car is moved; Harvey's dash-cam then records activities around the crash site. The camera is at least one tractor-trailer's length away from the crashed Ford Fusion, and the angle does not change for approximately 35 minutes until the recording ends. Fire-department and law-enforcement personnel walk around the Ford, looking underneath and opening its doors.

{¶ 13} An unmarked car parks in the left shoulder of the interstate, and an unidentified individual emerges from the car to take pictures or video of the crash site. An ambulance arrives around the same time. Harvey discusses with other officers and with emergency medical personnel the protocol for transporting Teofilo to the hospital in handcuffs. Harvey then accompanies Teofilo to the hospital in the ambulance.

{¶ 14} Harvey's dash-cam continues to record in her absence. During that time, an officer reports over the radio the last four digits of the vehicle-identification number and license-plate numbers for the Ford Fusion. Two unidentified individuals set up tripods and video equipment in the left shoulder.

{¶ 15} Harvey's recording ends about 9:30 a.m., nearly 58 minutes after it began.

*The second recording*

**{¶ 16}** The first of Perrin's two recordings begins about 8:35 a.m. and ends about 9:20 a.m. For the first six minutes, Perrin is driving on Interstate 275 to intercept the pursuit on Interstate 71. The Ford Fusion and Harvey's patrol car appear at 8:41 a.m., after Perrin has entered southbound Interstate 71.

**{¶ 17}** During the pursuit, Perrin's recording shows the same events leading up to Teofilo's arrest as does Harvey's, but from a different vantage point. At 8:51 a.m., Perrin stops on the right side of the highway facing south and joins the other law-enforcement personnel surrounding the crashed Ford Fusion. Because of the vehicle's position, Perrin's dash-cam does not provide a view of Teofilo's arrest, the crash site or the actions of any law-enforcement officers during Teofilo's arrest.

**{¶ 18}** After Teofilo is in custody, Perrin moves his car toward the left shoulder with the dash-cam pointing toward the interstate median. The camera stays in this position until the video recording ends at 9:21 a.m. During those 27 minutes, the video shows only northbound traffic, the center concrete barrier, and the arrival of individuals to take pictures of the crash site.

**{¶ 19}** The audio in Perrin's recording between 8:54 a.m. and 9:21 a.m. consists of Perrin's, other officers', and dispatchers' communications over the radio and discussions with other officers on site after Teofilo's arrest. The sound stops for about five minutes after Perrin states that his battery is dead. When the sound returns, Perrin is heard talking with Harvey about reopening the interstate, taking an inventory of the Ford, towing the car, and waiting for another OSHP unit to take measurements at the crash site. Although Perrin subsequently filed an incident report summarizing what he found during his administrative inventory of the vehicle, Perrin's camera does not record his search or his findings.

**{¶ 20}** The sound in Perrin's recording fades at 9:01 a.m. The only audible sounds from that point are muffled barking from Perrin's police dog and intermittent radio communications. The recording ends at 9:21 a.m.

*The third recording*

**{¶ 21}** The third recording shows images of an empty seat from Perrin's vehicle during the pursuit, starting at 8:35 a.m. and ending at 9:21 a.m. The audio consists of sirens and the same radio communications heard in the previous recordings.

**The Enquirer's request for records**

**{¶ 22}** On January 29, 2015, a reporter with the Enquirer sent an e-mail to OSHP requesting a copy of the dash-cam recordings, the incident report, and any 9-1-1 radio communications related to the pursuit of Teofilo. That same day, OSHP denied the request in its entirety, stating that the prosecutor had asked that the video not be released yet. In response to the Enquirer's request for a specific basis in the Public Records Act for denying its request, the OSHP replied in a January 30, 2015 e-mail that the records fall under the exception for confidential law-enforcement investigatory records and cited R.C. 149.43(A)(1)(h) and 149.43(A)(2).

**{¶ 23}** In an e-mail dated February 3, 2015, counsel for the Enquirer demanded the immediate production of the requested records. On February 11, 2015, the assistant public-records manager for ODPS released the incident report and 9-1-1 communications responsive to the Enquirer's request. ODPS continued to deny the Enquirer's request for the video recording:

> The dashboard camera video that you requested is part of an open criminal case that pertains to a law enforcement matter of criminal, quasi-criminal, civil, or administrative nature and whose release would create a high probability of disclosure of specific investigatory work product. Such records are not public records pursuant to ORC 149.43(A)(1)(h) and (A)(2)(c), the confidential law enforcement investigatory records exception to the public records laws.

6

**{¶ 24}** As support for its position, ODPS cited *State ex rel. Miller v. Ohio State Hwy. Patrol*, 2014-Ohio-2244, 14 N.E.3d 396 (12th Dist.), in which the court ruled that video footage recorded by a state trooper's in-car dash-cam fell within the exemption for confidential law-enforcement investigatory records. *Id.* at ¶ 25.

### The litigation

**{¶ 25}** On March 9, 2015, the Enquirer filed a mandamus action in this court alleging that respondents violated the Ohio Public Records Act, R.C. 149.43, by refusing to release the recordings. The Enquirer asked this court to order respondents to make the recordings available. The Enquirer also requested attorney fees, statutory damages, and court costs.

**{¶ 26}** Later in March, Teofilo pleaded guilty to one count of fleeing and eluding after receiving a signal from a police officer to stop and one count of carrying a concealed weapon.

**{¶ 27}** On May 1, 2015, ODPS provided copies of the recordings to the Enquirer, stating that the conclusion of legal proceedings involving Teofilo allowed for the release of the records. We granted an alternative writ and ordered the parties to file briefs and evidence. 144 Ohio St.3d 1437, 2015-Ohio-5468, 43 N.E.3d 449. The matter is now ripe for decision.

### ANALYSIS

**{¶ 28}** Mandamus is the appropriate remedy to compel compliance with the Public Records Act. *State ex rel. Cincinnati Enquirer v. Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, ¶ 10; *see also* R.C. 149.43(C)(1). To be entitled to a writ of mandamus, the Enquirer must establish by clear and convincing evidence a clear legal right to the requested relief and a clear legal duty on the part of respondents to provide the relief. *Sage* at ¶ 10. We construe R.C. 149.43 liberally in favor of broad access and resolve any doubt in favor of disclosure. *State ex rel.*

*Toledo Blade v. Seneca Cty. Bd. of Commrs.*, 120 Ohio St.3d 372, 2008-Ohio-6253, 899 N.E.2d 961, ¶ 17.

**Mootness**

{¶ 29} We first address whether ODPS's release of the records moots this action. Producing the requested records, as respondents have done here, generally moots a public-records case. *See id.* at ¶ 43; *State ex rel. Glasgow v. Jones,* 119 Ohio St.3d 391, 2008-Ohio-4788, 894 N.E.2d 686, ¶ 27. We have recognized, however, an exception to mootness if a claim is " 'capable of repetition, yet evading review.' " *State ex rel. Cincinnati Enquirer v. Heath*, 121 Ohio St.3d 165, 2009-Ohio-590, 902 N.E.2d 976, ¶ 11, quoting *State ex rel. Dispatch Printing Co. v. Geer*, 114 Ohio St.3d 511, 2007-Ohio-4643, 873 N.E.2d 314, ¶ 10.

> This exception "applies only in exceptional circumstances in which the following two factors are both present: (1) the challenged action is too short in its duration to be fully litigated before its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."

*Id.,* quoting *State ex rel. Calvary v. Upper Arlington*, 89 Ohio St.3d 229, 231, 729 N.E.2d 1182 (2000).

{¶ 30} Both factors are present here. ODPS provided the dash-cam recordings after the Enquirer filed its mandamus action, stating that the conclusion of Teofilo's legal proceedings allowed for the release of the records. The short duration of Teofilo's criminal proceedings and ODPS's subsequent release of the recordings truncated the Enquirer's ability to fully litigate its mandamus claim before us.

{¶ 31} We also recognize the public interest in dash-cam recordings. Without resolution of the questions at issue here, we can reasonably expect the

Enquirer and other media outlets to continue to request dash-cam recordings and law-enforcement agencies to continue to withhold them. Under these circumstances, we conclude that the Enquirer's claim is not moot, and we proceed with the merits of the Enquirer's claim under the applicable version of the Public Records Act, effective September 29, 2013 to March 19, 2015. *See* former R.C. 149.43, 2013 Am.Sub.H.B. No. 59.

### The Public Records Act

**{¶ 32}** We begin with the premise that " 'public records are the people's records, and that the officials in whose custody they happen to be are merely trustees for the people.' " *State ex rel. Natl. Broadcasting Co., Inc. v. Cleveland*, 38 Ohio St.3d 79, 81, 526 N.E.2d 786 (1988), quoting *State ex rel. Patterson v. Ayers*, 171 Ohio St. 369, 371, 171 N.E.2d 508 (1960). The Public Records Act codifies this right to access government records and provides, "Upon request * * *, all public records responsive to the request shall be promptly prepared and made available for inspection to any person at all reasonable times during regular business hours." Former R.C. 149.43(B)(1).

**{¶ 33}** A "public record" is any record "kept by any public office." R.C. 149.43(A)(1). ODPS and OSHP both qualify as a "public office," which includes "any state agency * * * established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). "Record" is defined as "any document, device, or item, regardless of physical form or characteristic * * * created or received by or coming under the jurisdiction of any public office of the state or its political subdivisions, which serves to document the organization, functions, policies, decisions, procedures, operations, or other activities of the office." R.C. 149.011(G). The definition of "record" encompasses "almost all documents memorializing the activities of a public office," unless otherwise exempt. *See Kish v. Akron*, 109 Ohio St.3d 162, 2006-Ohio-1244, 846 N.E.2d 811, ¶ 20, citing *State*

*ex rel. Beacon Journal Publishing Co. v. Bond*, 98 Ohio St.3d 146, 2002-Ohio-7117, 781 N.E.2d 180, ¶ 13.

{¶ 34} The dash-cam recordings at issue here qualify as "records" because they memorialize the activities of employees of the OSHP. According to OSHP's policy manual on audio-video use, troopers are expected to "record traffic stops, pursuits, and other public contacts occurring within the operating range of the camera." In a section entitled "Use of Recordings for Purposes Other Than Evidence," the manual advises troopers that recordings may be used for officer-safety review, media requests, public information, training, possible civil litigation, and protection from unfounded complaints against officers. The dash-cam recordings fit within the definition of a "record" because they document governmental activities, decisions, and operations during a traffic stop and pursuit. *See Kish* at ¶ 20 ("any record that a government actor uses to document the organization, policies, functions, decisions, procedures, operations, or other activities of a public office can be classified reasonably as a record"). Having reached this conclusion, we turn next to the question whether an exception applies to preclude their release.

**Exception for confidential law-enforcement investigatory records**

{¶ 35} To justify their refusal to provide the recordings to the Enquirer, respondents have the burden to show that the withheld records fall squarely within a statutory exception. *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 10. We strictly construe these exceptions against the public-records custodian. *Id.*

{¶ 36} In its February 11, 2015 letter to the Enquirer, ODPS invoked the exception for confidential law-enforcement investigatory records and argued that disclosure of the recordings would create a high probability of disclosure of specific investigatory work product. *See* R.C. 149.43(A)(1)(h) and 149.43(A)(2)(c). To consider this, we return to the Act's definitions.

{¶ 37} R.C. 149.43(A)(2) defines a "confidential law enforcement investigatory record" as

> any record that pertains to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure of any of the following:
>
> * * *
>
> (c) Specific confidential investigatory techniques or procedures or specific investigatory work product.

{¶ 38} For this exception to apply, respondents must therefore establish that each of the withheld recordings "pertains to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature" and that its release would create a high probability of disclosure of specific confidential investigatory techniques or procedures or specific work product. R.C. 149.43(A)(2). *See State ex rel. Miller v. Ohio State Highway Patrol*, 136 Ohio St.3d 350, 2013-Ohio-3720, 995 N.E.2d 1175, ¶ 25. And here, only investigatory work product is at issue.

*1. Pertains to law-enforcement matter of a criminal nature*

{¶ 39} The recordings easily meet the first part of this test: they pertain to a law-enforcement matter of a criminal or quasicriminal nature. OSHP has authority to enforce laws relating to the operation of vehicles on roads and highways in the state. *See* R.C. 5503.02. Harvey attempted to initiate a traffic stop based on her observations that Teofilo was operating his vehicle in violation of the law. Harvey noted specific instances of traffic violations by Teofilo, including driving outside the marked lines, R.C. 4511.33, changing lanes without signaling, R.C. 4511.39, and failing to comply with the signal of a police officer, R.C. 2921.331(B). The Revised Code penalizes a violation of these provisions as misdemeanor or felony

criminal offenses. The recordings therefore meet the first part of the test for a confidential law-enforcement investigatory record.

## 2. *Specific investigatory work product*

{¶ 40} But a record that merely pertains to a law-enforcement matter does not constitute a confidential law-enforcement investigatory record unless the release of the record would create a high probability of disclosure of specific investigatory work product. Our review of the recordings at issue here leads us to conclude that a 90-second portion of the recordings contains specific investigatory work product, but the remainder does not.

{¶ 41} R.C. 149.43 does not define "specific investigatory work product." In *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 639 N.E.2d 83 (1994), we applied the principles of attorney work product and concluded that the investigative work-product exception in R.C. 149.43(A)(2)(c) protects " 'any notes, working papers, memoranda or similar materials, prepared by * * * [here, by law enforcement officials] in anticipation of litigation.' " (Brackets sic.) *Id.* at 434, quoting *Black's Law Dictionary* 1606 (6th Ed.1990). Stated another way, unless Crim.R. 16 requires disclosure, "information assembled by law enforcement officials in connection with a probable or pending criminal proceeding is, by the work product exception found in R.C. 149.43(A)(2)(c), excepted from required release as said information is compiled in anticipation of litigation." *Steckman* at 435.

{¶ 42} The protection for work product emanates from a concern that investigators and prosecutors should be free to gather, assemble, and prepare case information and theories " 'without undue and needless interference.' " *Id.* at 434, quoting *Hickman v. Taylor*, 329 U.S.495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Since *Steckman*, we have clarified that the investigative-work-product rule is a "very narrow exception[ ] to R.C. 149.43" that "applies to actual pending or highly

12

probable criminal prosecutions." (Emphasis deleted.) *State ex rel. Police Officers for Equal Rights v. Lashutka*, 72 Ohio St.3d 185, 188, 648 N.E.2d 808 (1995).

{¶ 43} Respondents argue that all recordings of traffic stops and pursuits constitute investigatory work product because they document evidence of criminal activity in furtherance of prosecution. Respondents' blanket assertion of privilege, however, is at odds with the well-settled understanding that investigatory work product is entitled to qualified, not absolute, protection from disclosure. *See, e.g.*, *United States v. Nobles*, 422 U.S. 225, 238-239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) (protection of attorney work product prepared by investigative agents in preparation for trial "is not absolute" and may be waived); *J & C Marketing, L.L.C. v. McGinty*, 143 Ohio St.3d 315, 2015-Ohio-1310, 37 N.E.3d 1183, ¶ 18 (privilege for law-enforcement investigatory information requested in civil discovery "is not absolute").

{¶ 44} In *Steckman*, we recognized that the work-product exception in R.C. 149.43 does not automatically shield all potential evidence of criminal activity from disclosure. We concluded that "[t]he work product exception does not include ongoing routine offense and incident reports, including, but not limited to, records relating to a charge of driving while under the influence and records containing the results of intoxilyzer tests." *Steckman*, 70 Ohio St.3d at 435, 639 N.E.2d 83. We have affirmed since *Steckman* that police incident reports are subject to disclosure. *State ex rel. Beacon Journal Publishing Co. v. Maurer*, 91 Ohio St.3d 54, 741 N.E.2d 511 (2001). But we have also clarified that *Maurer* "did not adopt a per se rule that all police offense-and-incident reports are subject to disclosure notwithstanding the applicability of any exemption." *State ex rel. Beacon Journal Publishing Co. v. Akron*, 104 Ohio St.3d 399, 2004-Ohio-6557, 819 N.E.2d 1087, ¶ 55, 56 (police incident reports may be redacted to eliminate personal information concerning child rape victim).

{¶ 45} We therefore decline to adopt an interpretation of the investigative-work-product exception that would shield from disclosure all dash-cam recordings in their entirety merely because they contain potential evidence of criminal activity that may aid in a subsequent prosecution. And we also decline to adopt a per se rule subjecting all dash-cam recordings to disclosure notwithstanding the applicability of any exception. Instead, the recordings at issue here illustrate that a dash-cam recording, as a whole, may not easily fall in or outside the exception. Rather, the three recordings contain images that have concrete investigative value specific to the prosecution of Teofilo that may be withheld, but also contain images that have little or no investigative value that must be disclosed. A case-by-case review is necessary to determine how much of the recordings should have been disclosed.

{¶ 46} Based on our review of the recordings, we conclude that about 90 seconds of Harvey's recording—when Harvey takes Teofilo to her patrol car, reads him his *Miranda* rights, and questions him—could have been withheld as investigative work product compiled in anticipation of litigation. Harvey conducted her questioning of Teofilo inside the patrol car, away from public view. And by informing Teofilo of his rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Harvey intended to secure admissible statements for the prosecution's later use at trial. This 90-second portion, therefore, could have been withheld.

{¶ 47} The remaining portions of the recordings, however, are not exempt from public disclosure. First, the investigative information in the recordings duplicates in large part the same information in the incident reports, which ODPS released promptly without redaction. Harvey noted in her dash-cam recording that she observed Teofilo driving outside the marked lines, changing lanes without signaling, and fleeing her signal to stop. Harvey's incident report contained the same recitation of events. But the report also described investigative steps that were

not shown on the dash-cam recordings. The report summarized the results of Perrin's administrative search of the Ford Fusion, including the discovery of a loaded revolver with a filed-off serial number. Neither Harvey's nor Perrin's dash-cam, however, recorded Perrin's search. Harvey's dash-cam was too far from the crash site—at least one tractor-trailer's length away—to record any of Perrin's investigative activities. And Perrin's dash-cam pointed toward the median, not the crash site. While there may be circumstances where the disclosure of investigative work product might impede a criminal prosecution, that concern is not implicated here, where the work product (and more) had already been disclosed by other means.

{¶ 48} Second, under the OSHP policy, troopers are expected to record all pursuits and traffic stops, regardless of whether a criminal prosecution may follow. The dash-cams here began to record automatically as soon as the troopers activated their emergency lights and siren, so the troopers did not exercise any investigatory discretion in activating their dash-cams. In contrast, OSHP does not require troopers to record crashes and leaves it to the discretion of troopers to determine when evidence at a crash scene is necessary for prosecution. In those circumstances, respondents would have a better argument that a dash-cam recording was prepared in anticipation of litigation. The troopers here, however, did not make any investigative decisions to activate their dash-cams.

{¶ 49} Finally, a large portion of the recordings did not involve any investigative functions at all. For example, the recordings showed the arrival of various individuals who took pictures or video of the crash site. They recorded discussions between troopers about matters of public safety, including reopening highway traffic and transporting Teofilo to the hospital. And the third recording showed nothing but the empty back seat of Perrin's car. Under even the most generous view of investigative work product, these images held no investigative value and should have been disclosed.

**{¶ 50}** In the end, we hold that decisions about whether an exception to public-records disclosure applies to dash-cam recordings require a case-by-case review to determine whether the requested recordings contain investigative work product. Having reviewed the three recordings at issue here, we conclude that respondents should have released all three recordings to the Enquirer upon request, with the 90 seconds of post-*Miranda* questioning of Teofilo redacted as investigatory work product.

**Attorney fees, statutory damages, and court costs**

**{¶ 51}** We now address relator's request for attorney fees, statutory damages, and court costs.

**{¶ 52}** Former R.C. 149.43(C)(2)(b) authorized a discretionary award of reasonable attorney fees and governs our analysis here:

> If the court renders a judgment that orders the public office or the person responsible for the public record to comply with division (B) of this section, the court may award reasonable attorney's fees subject to reduction as described in division (C)(2)(c) of this section.

**{¶ 53}** When considering whether to award attorney fees in public-records cases, a court may consider the presence of a public benefit conferred by a relator seeking the disclosure and the reasonableness and good faith of a respondent in refusing to disclose. *State ex rel. Doe v. Smith*, 123 Ohio St.3d 44, 2009-Ohio-4149, 914 N.E.2d 159, ¶ 33-34.

**{¶ 54}** Applying this standard, we deny the Enquirer's request for attorney fees. Respondents acted reasonably and in good faith in withholding the dash-cam recordings until the conclusion of all probable or pending criminal proceedings involving Teofilo. Respondents relied on *State ex rel. Miller v. Ohio State Hwy. Patrol*, 2014-Ohio-2244, 14 N.E.3d 396 (12th Dist.), a case of first impression in

16

which the court concluded that an OSHP dash-cam recording was exempt from disclosure as a confidential law-enforcement investigatory record. *Id*. at ¶ 33. At the time of the request, *Miller* was the only Ohio decision of record to squarely address this issue. Respondents operated on a reasonable, good-faith belief, based on existing case law, that their conduct did not violate R.C. 149.43. We therefore deny the Enquirer's request for attorney fees.

{¶ 55} We also deny the Enquirer's request for statutory damages and court costs because the Enquirer failed to transmit its request by hand delivery or certified mail. The Public Records Act does not require a requestor to make a written request or to deliver a request in any particular manner. *See* R.C. 149.43(B)(5). However, the plain language of R.C. 149.43(C) does require the relator to transmit a written request by hand delivery or certified mail in order to recover statutory damages and court costs. R.C. 149.43(C)(1) provides for statutory damages and states in part:

> *If a requestor transmits a written request by hand delivery or certified mail* to inspect or receive copies of any public record in a manner that fairly describes the public record or class of public records to the public office or person responsible for the requested public records, except as otherwise provided in this section, the requestor shall be entitled to recover the amount of statutory damages set forth in this division if a court determines that the public office or the person responsible for public records failed to comply with an obligation in accordance with division (B) of this section.

(Emphasis added.)

{¶ 56} R.C. 149.43(C)(2)(a) provides for court costs:

If the court issues a writ of mandamus that orders the public office or the person responsible for the public record to comply with division (B) of this section *and determines that the circumstances described in division (C)(1) of this section exist,* the court shall determine and award to the relator all court costs.

(Emphasis added). The "circumstances described in division (C)(1)" include the relator's transmission of a written request by hand delivery or certified mail.

**{¶ 57}** Here, the Enquirer did not transmit its request by hand delivery or certified mail, and it therefore failed to comply with the requirements for recovering statutory damages and court costs. The Enquirer sent to ODPS its initial January 29, 2015 request, as well as its two subsequent requests for clarification on January 30 and February 3, 2015, by e-mail.

**{¶ 58}** We therefore deny the Enquirer's request for attorney fees, statutory damages, and court costs.

## CONCLUSION

**{¶ 59}** For all these reasons we hold that, subject to redaction, the Enquirer had a clear legal right to the requested records and that respondents had a clear legal duty to provide the records in accordance with R.C. 149.43(B)(1). We deny relator's request for attorney fees, statutory damages, and court costs.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, and KENNEDY, JJ., concur.

O'NEILL, J., concurs in part and dissents in part, with an opinion.

_____

**O'NEILL, J., concurring in part and dissenting in part.**

**{¶ 60}** Despite my agreement with the majority's decision to release the public records requested by relator, the Cincinnati Enquirer, in this case, I dissent

from the decision not to award attorney fees to the Enquirer. Ultimately, the records at issue were released to the Enquirer after a lawsuit was filed, but significantly, this court did not dismiss this case as moot. Instead, this court recognized that this issue is capable of repetition yet evading review.

{¶ 61} Whether police dash-cam recordings are public records is a major public-policy question in Ohio. But it is wrong for this court to recognize the clear public interest in police dash-cam recordings and then to deny the Enquirer reasonable attorney fees after it shed light on this ongoing dispute between the state's need for privacy and the public's right to know what is going on.

{¶ 62} The majority's conclusion that the good faith of law enforcement outweighs the benefit to the public establishes a blueprint for state agencies to stonewall valid requests for public records and then assert a good-faith defense when called into court. This could have a serious chilling effect on the willingness of the press to litigate public-records requests all the way to the Supreme Court of Ohio. Our failure to award attorney fees to the prevailing party essentially rewards bad behavior. "Catch me if you can" should not be the legal standard applied in important policy questions.

{¶ 63} The Enquirer could have saved attorney fees by abandoning this action as soon as the records were produced but it did not, and the law of Ohio is more easily understood as a result of their tenacity. The Enquirer has prevailed on the merits in this case. I would award reasonable attorney fees pursuant to former R.C. 149.43(C)(2)(b), 2013 Am.Sub.H.B. No. 59.

_____

Graydon, Head & Ritchey, L.L.P., John C. Greiner, and Darren W. Ford, for relator.

Michael DeWine, Ohio Attorney General, and Jeffrey W. Clark, Hilary R. Damaser, and Morgan Linn, Assistant Attorneys General, for respondents.

Gregg Marx, Fairfield County Prosecuting Attorney, and Joshua S. Horacek, Assistant Prosecuting Attorney, in support of respondents, for amicus curiae, Ohio Prosecuting Attorneys Association.

_____