[Cite as *Naymik v. Northeast Ohio Areawide Coordinating Agency*, 2018-Ohio-1718.]

| | |
|---|---|
| MARK NAYMIK | Case No. 2017-00919PQ |
| Requester | Special Master Jeffery W. Clark |
| v. | <u>REPORT AND RECOMMENDATION</u> |
| NORTHEAST OHIO AREAWIDE COORDINATING AGENCY | |
| Respondent | |

{¶1} On October 23, 2017, requester Mark Naymik, a reporter for cleveland.com, made a public records request to Grace Gallucci, Executive Director of respondent Northeast Ohio Areawide Coordinating Agency (NOACA):

> My colleagues and I are contacting all the players involved in creating the region's Amazon bid. We are asking those public entities – such as Noaca – to shed some light on the facts, figures and information you were asked to compile for the process. Formally, we are asking for copies of any materials provided to Team NEO (or any other organizations or public entity producing the bid).

(Complaint at 5.) On October 31, 2017, counsel for NOACA denied the request, stating that the requested records were trade secret of all agencies and entities involved in the bid. (*Id.* at 2.) On November 14, 2017, Naymik filed a complaint under R.C. 2743.75 alleging denial of access to public records by NOACA in violation of R.C. 149.43(B). Following unsuccessful mediation, NOACA filed a motion to dismiss the complaint on February 13, 2018 (Response). On March 8, 2018, NOACA filed copies of the responsive records under seal, and an additional pleading and affidavit. On April 3, 2018, Naymik filed a reply to NOACA's pleadings.

{¶2} Ohio's Public Records Act, R.C. 149.43, provides a remedy for production of records under R.C. 2743.75 if the court of claims determines that a public office has denied access to public records in violation of R.C. 149.43(B). The policy underlying the

Act is that "open government serves the public interest and our democratic system." *State ex rel. Dann v. Taft,* 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472, ¶ 20. "[O]ne of the salutary purposes of the Public Records Law is to ensure accountability of government to those being governed." *State ex rel. Strothers v. Wertheim*, 80 Ohio St.3d 155, 158, 684 N.E.2d 1239 (1997). Therefore, the Act "is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records." *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 376, 662 N.E.2d 334 (1996). Claims under R.C. 2743.75 are determined using the standard of clear and convincing evidence. *Hurt v. Liberty Twp.*, 5th Dist. Delaware No. 17CAI050031, 2017-Ohio-7820, ¶ 27-30.

{**¶3**} There is no dispute that NOACA is a public office and that the withheld document is a record of its official functions. NOACA moves to dismiss the complaint on the sole ground that the record, in its entirety, constitutes trade secret.

**Motion to Dismiss**

{**¶4**} In construing a motion to dismiss pursuant to Civ.R. 12(B)(6), the court must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). Then, before the court may dismiss the complaint, it must appear beyond doubt that plaintiff can prove no set of facts entitling him to recovery. *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 245, 327 N.E.2d 753 (1975). The unsupported conclusions of a complaint are, however, not admitted and are insufficient to withstand a motion to dismiss. *Mitchell* at 193.

{**¶5**} Naymik alleges that the requested records contain "facts, figures and information [NOACA was] asked to compile for" a government bid to host the site of a second Amazon, Inc. headquarters (HQ2). While respondent may defend a public records claim by proving that the records are subject to an exception, the defense of

trade secret is not proven on the face of the complaint. I therefore recommend that the motion to dismiss be DENIED, and the matter determined on the merits.

**NOACA Claims Trade Secret Only On Its Own Behalf**

In its denial correspondence, respondent asserted that

> [t]he requested records are proprietary and a "trade secret" of the Northeast Ohio Areawide Coordinating Agency, Amazon, Inc. and the various public and private entities that supplied information in the records * * *.

(Complaint at 2.) However, in its pleadings NOACA claims trade secret only on its own behalf. The court notes that although the Uniform Trade Secrets Act provides that "[a]ctual or threatened misappropriation may be enjoined" by an entity claiming trade secret, NOACA has not informed the court of pending efforts by any entity to enjoin the potential release of the information as a public record. *See* R.C. 1333.62(A).

**The Withheld Records**

{¶6} NOACA is a regional transportation and environmental planning organization funded by public monies. (Gallucci Aff. at ¶ 2, 20.) It has purchased equipment, assembled data, and programmed software for its Travel Forecasting Model and GIS system to conduct transportation planning analysis, and can present the results as statistics, graphics, and maps. (*Id.* at ¶ 5-14.) NOACA member entities City of Cleveland and Cuyahoga County requested NOACA to assist them in responding to the Amazon HQ2 request for proposals (RFP) by compiling information to show the impact of the proposed HQ2 site on existing traffic, roadways and transit systems in the NOACA planning area. (*Id.* at ¶ 4, 7.) Respondent describes the records provided to Team NEO, the agency coordinating the bid, as follows:

> The information includes graphic illustrations, in the form of maps, showing relative drive times to various locations, proximity of and travel times related to various modes of public transportation to key locations in the region, availability of active transportation (bike paths and sidewalk networks), traffic congestion and traffic delay statistics, population densities relative to regional transit systems and job hubs. The information

also includes special incentives to promote employee transportation on the public transportation system (principally light rail and buses) maintained by the Greater Cleveland Regional Transit Authority. All information is presented relative to the specific Amazon HQ2 site, and the specific location of the proposed site is readily ascertainable from review of the requested information.

(Response at 4-5.) The NOACA document is only a portion of the Team NEO RFP response. (Gallucci Aff. at ¶ 18.) The first two pages of the records submitted under seal are paginated as 24 and 25 – presumably their location within a larger bid document. As paginated by respondent for the court, pages one through eight contain text and statistics promoting Northeast Ohio transportation, entertainment, and freight advantages. (*Id.* at ¶ 28-32.) Pages nine through 27[1] contain 17 maps and related narrative text. The entire document is couched in promotional language extolling area virtues relating to business, residence, travel, health, education, attractions, entertainment, and dining.

### Ohio Uniform Trade Secrets Act

{¶7} The Ohio Uniform Trade Secrets Act is "a state law exempting trade secrets from disclosure under R.C. 149.43." *State ex rel. Perrea v. Cincinnati Pub. Sch.*, 123 Ohio St.3d 410, 2009-Ohio-4762, 916 N.E.2d 1049, ¶ 19. R.C. 1333.61(D) provides that:

"Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper

---

[1] Although respondent refers to the document as 28 pages in length, pages ten and eleven are exact duplicates.

means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

NOACA does not allege that the printed HQ2 document would reveal any "scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement." Naymik did not ask NOACA for a copy of the "unique * * * software tools and applications used for its transportation planning responsibilities for the region." (Gallucci Aff. at ¶ 26.) NOACA asserts only that the withheld output from these tools is business information that (1) derives independent economic value from not being generally known, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. (Response at 4-8.)

{¶8} An *in camera* inspection is usually necessary to determine if a claim of trade secret has merit. *State ex rel. Besser v. Ohio State Univ.*, 87 Ohio St.3d 535, 541-542, 721 N.E.2d 1044 (2000) ("*Besser I*"). The following factors are used in the trade secret analysis:

(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State University*, 89 Ohio St.3d 396, 399-400, 732 N.E.2d 373 (2000) ("*Besser II*").

**Burden of Proof**

{¶9} "Exceptions to disclosure must be strictly construed against the public records custodian, and the custodian bears the burden to establish the applicability of an exception." *Besser II* at 398-400. "A custodian does not meet this burden if it has

not proven that the requested records fall squarely within the exception." *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 10. A proponent's "reliance on conclusory affidavit statements is insufficient to satisfy its burden to identify and demonstrate that the records withheld and portions of records redacted are included in categories of protected information under R.C. 1333.61(D)." *Besser II* at 404. *Accord Harris v. Belvoir Energy, Inc.*, 8th Dist. Cuyahoga No. 103460, 2017-Ohio-2851, ¶ 16.

**Entire Document Is Not Trade Secret**

{¶10} NOACA argues that every word in the document provides it with "competitive advantage" by being kept secret, and is therefore trade secret. (Gallucci Aff. at ¶ 22-23, 33, 35.) However, much of the document consists of descriptive, conclusory statements and promotional rhetoric. On its face, such text has no plausible independent economic value to others, and respondent offers no evidence to the contrary.

{¶11} NOACA also states that disclosing the particular attributes featured in the bid would allow competing cities to "respond very specifically and proactively to the attributes NOACA has chosen to illustrate." (*Id.* at ¶ 23, 33.) However, the "benefit" of concealing the region's relevant attributes is not only contrary to NOACA's mission, but is belied by its exhaustive publication of the same information online. There is no evidence that a competitor who wishes to distinguish its attributes from those of Cleveland cannot obtain a wealth of specific data and declared attributes from NOACA's published material and elsewhere online.

{¶12} I find that NOACA fails to prove that the document as a whole is trade secret. It is therefore required to redact only specific information shown to be exempt:

> If a public record contains information that is exempt from the duty to permit public inspection or to copy the public record, the public office or the person responsible for the public record shall make available all of the information within the public record that is not exempt.

R.C. 149.43(B)(1). *Accord Besser I, supra.* NOACA asserts that it was unable to redact only trade secret information from the HQ2 document. (Response at 11.) However, on review I find that the individual data, statistics, and maps are not so intertwined with the rest of the content that they could not be redacted. *State ex rel. Rocker v. Guernsey Cty. Sheriff's Office*, 126 Ohio St.3d 224, 2010-Ohio-3288, 932 N.E.2d 327, ¶ 12-14. The court's analysis thus turns to whether NOACA has proven that any specific items of information within the document fall squarely within the definition of trade secret.

**Respondent Identifies Few Specific Items as Trade Secret**

{¶13} A proponent may not compel a court to guess what items within a document are the proponent's trade secret. Rather, "[a]n entity claiming trade secret status bears the burden to *identify* and demonstrate that the material is included in categories of protected information under the statute." (Emphasis added.) *Besser II* at 400; *Perrea*, 123 Ohio St.3d 410, 2009-Ohio-4762, 916 N.E.2d 1049 at ¶ 25. Accordingly, the special master required NOACA to submit

> [a]n affidavit that separately identifies by page, paragraph, line, and word, as appropriate, each portion of the responsive records that respondent asserts as meeting the definition of "trade secret."

(Order of January 21, 2018.) *See* R.C. 2743.75(E)(3)(c). However, NOACA has separately identified only two specific items: 1) an offer of discount transit passes for Amazon employees, and 2) the location of the proposed site for HQ2. (Gallucci Aff. at ¶ 32; Response at 3, 5.) NOACA has specified no other individual items, providing only conclusory statements about "the information" generally.

{¶14} I find that respondent has not met its initial burden to identify what items are claimed as trade secret, other than the transit pass discount and site location. Although this omission is sufficient to conclude that no material other than the two specified items need be considered further, the analysis below will apply to all data, statistics, and maps in the document.

**Application of Besser Factors To The Withheld Record**

**(1) The extent to which the information is known outside the business.**

{¶15} The regional transportation, logistics and other information contained in the document is known to anyone who accesses NOACA's web site, http://www.noaca.org/, and other online resources.[2] Notably, AIM Forward 2040, NOACA's Long-Range Transportation Plan for Northeast Ohio,[3] contains maps that are identical or functionally identical to those in the HQ2 document illustrating [Combined] Transit Coverage (p. 60), Walk Accessibility to Rail Stations (p. 228), Walk Accessibility to Park N Ride Locations (p. 227), Existing and Proposed Future Rail Lines (p. 229), Bikeway Inventory (p. 61, 109), Sidewalk Network (p. 62, 110), and regional and downtown Entertainment Options (p. 118). AIM Forward 2040 also contains traffic congestion, traffic delay, population density, and many other data points and statistics found in the HQ2 document. Additional matching information likely exists in other reporting, constituent service, and research documents on NOACA's extensive web site. (Respondent's Response to Order at 1-2.) It is clear that identical or functionally identical information relating to the bid site is readily available to the public.

{¶16} NOACA admits that the HQ2 document also includes information from statistical and tracking tools "available outside of NOACA," and data collected "from various sources." (Gallucci Aff. at ¶ 5, 11, 16, 33.) The document expressly credits data, statistics, and accolades sourced from the Brookings Institution, INRIX, Institute for Transportation and Development Policy, NOACA Transit Oriented Development Plan, Walk Score, Business Insider, rethinkcleveland.org (Cleveland Department of Economic Development), ProximityOne, APTA (American Public Transportation Association) 2016 Fact Book, NOACA Long Range Transportation Plan, NOACA/Cleveland Regional

---

[2] *E.g.*, rethinkcleveland.org

[3] Referenced in the HQ2 document, and available at www.noaca.org/index.aspx?page=7544 (Accessed April 24, 2018.)

Transit Authority Transit Oriented Development Scorecard and Implementation Plan, League of American Bicyclists' report on 2014 American Community Survey Data, U.S. Census Bureau report: "Modes Less Traveled-Bicycling and Walking to Work in the United States: 2008-2012," Amusement Today, and Time Magazine. In addition, a map for Bicycle Coverage of Downtown Cleveland can be accessed on the Cleveland City Planning Commission web site,[4] and maps of Entertainment Options in Downtown Cleveland are available from a host of sites.[5] For drive time maps, online tools are available to create a drive time isochrone surrounding any location.[6]

{¶17} Based on the above, I find that NOACA's broad assertion that "the information contained in [the document] is not available from any other source in the region" is not credible. (Gallucci Aff. at ¶ 33, 35.) Instead, it is clear that most of the information contained in the document is "generally known" or "readily ascertainable" to the public. R.C. 1333.61(D)(1). In *Besser II*, the Court found that a preliminary business plan was not trade secret (except for a page listing names of top-volume physicians), in part because some of the information was already readily ascertainable to the public from other OSU and Ohio Hospital Association records. *Besser II* at 401-402. While Naymik admits that the proposed HQ2 site is not known outside NOACA (Reply at 7), NOACA's failure to testify that other specific items are truly unavailable means this court lacks evidence that any particular item "is not known outside" NOACA.

**(2) The extent to which it is known to those inside the business, i.e., by the employees.**

{¶18} NOACA employees would be at least as aware as the public of the generally known and readily ascertainable information listed above. Moreover, as researchers who compile data and use tracking and statistical tools from both inside

---

[4] http://planning.city.cleveland.oh.us/bike/assets/Masterplan_Apr2016.pdf "Cleveland Bikeways Master Plan" (Accessed April 24, 2018.)

[5] E.g., http://www.thisiscleveland.com/planning-tools/maps/ (Accessed April 24, 2018.)

[6] E.g., TravelTime platform, https://www.traveltimeplatform.com/driving-radius-map/ (Accessed April 24, 2018.)

and outside NOACA, they are much better positioned to know or readily ascertain the same information. (Gallucci Aff. at ¶ 5, 13.) Only the final form of the HQ2 document, and the transit pass discount and site location, appear to be closely held within the agency. (Response at 9; Gallucci Aff. at ¶ 15-19.)

**(3) The precautions taken by the holder of the trade secret to guard the secrecy of the information.**

{¶19} Other than the transit pass discount and site location, most or all the information in the HQ2 document is clearly not secret where it appears in NOACA's publications and through other publicly accessible sources. Also, while trade secret is not waived by inclusion in an application or proposal, *State ex rel. Seballos v. School Emp. Retirement Sys.*, 70 Ohio St.3d 667, 671, 640 N.E.2d 829 (1994), neither does the bidding process enable blanket assertion of trade secret. Bidding content must be individually scrutinized against trade secret standards to determine if any part qualifies. *State ex rel. Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 525-526, 687 N.E.2d 661 (1997); *Besser II* at 401-402. NOACA attests that the final electronic and hard copies of the prepared response are kept secret within the agency, but does not point to any legal restriction on Amazon, Inc. from disclosing any or all of the NOACA document.[7]

{¶20} In support of this factor, NOACA claims that "holding the information contained in bid packages in a competitive bid situation is very common, and done very much in the normal course of business." Naymik responds that a number of HQ2

---

[7] Nor could NOACA enter into an enforceable promise of confidentiality with respect to public records. *State ex rel. Findlay Publ. Co. v. Hancock Cty. Bd. of Commrs.*, 80 Ohio St.3d 134, 137, 684 N.E.2d 1222 (1997). In any case, a confidentiality agreement standing alone cannot support a trade secret claim. *Plain Dealer*, 80 Ohio St.3d 513, 527, 687 N.E.2d 661 (1997).

bidders nationally have disclosed most or all of their bid terms.[8] (Reply at 4.) Every other Ohio city has publicly disclosed its bid for HQ2.[9]

### (4) The savings effected and the value to the holder in having the information as against competitors.

{¶21} NOACA makes no effort to quantify the savings effected and the value to it in having the information as against competitors. NOACA's sole description of such value is that the information would make competitor cities aware of the region's attributes and thus be better able to argue against them. However, records that concern strategy, planning, bids and negotiations do not automatically qualify as trade secrets, particularly where the attempted transaction has failed. *Plain Dealer, supra*. In *Besser II*, the Court found that a public office's business plan, staffing contract, profit/loss analysis, acquisition goal summaries, working assumptions for operations, notes and research on comparable hospitals, draft asset purchase agreement, and pro forma for acquisition of a hospital were not proven to be trade secret. *Besser II* at 399-406. The court rejected OSU's argument that if it entered into future negotiations similar to the failed transaction, opposing parties could use these bid details "to determine OSU's valuation process, negotiating style, and internal processes for making and receiving offers, and that competitors can use this information even now to attack, undermine, and circumvent OSU's business strategies," finding that OSU had provided no factual evidence to support its conclusory statements and arguments. *Besser II* at 401-402.

{¶22} Here, NOACA has provided no factual evidence that its selection of data and illustrations for the HQ2 document is so unique, compelling, or otherwise valuable

---

[8] *See, e.g.*, http://www.businessinsider.com/amazon-hq2-20-finalist-cities-revealed-2018-1; https://www.muckrock.com/news/archives/2017/nov/07/amazon-hq2/. (Accessed April 24, 2018.)

[9] **Columbus** (selected as a finalist): https://www.columbusnavigator.com/columbus-amazon-incentives-hq2/, no redactions; **Cincinnati** (joint bid with **Dayton** and **Northern Kentucky**) – article describing documents obtained through public records request: http://www.13abc.com/content/news/Cincinnati-offered-urban-cool-in-failed-Amazon-HQ2- bid--476488413.html;
**Toledo**: http://www.toledoblade.com/attachment/2017/10/19/Toledo-Amazon-HQ2-proposal.pdf;
**Maumee:** http://toledobladedata.com/pdfs/amazonfinal.pdf. (Accessed April 24, 2018.)

that competitors would gain a cognizable economic benefit from its disclosure. As noted in (1) above, it is a straightforward matter to assemble data, maps, future planning, and other information identical to, functionally identical to, or at this point even more current than, the information in NOACA's withheld records.

{¶23} NOACA's reference to using "similar" information in its bid for the 2016 Republican National Convention, a dramatically different engagement in time span, relevant transportation and logistics, etc., only emphasizes that the factors for future bids will be different, and that keeping the data, statistics, maps and promotional rhetoric from the HQ2 bid a secret will not benefit NOACA's future transactions. *Besser II, supra.*

### (5) The amount of effort or money expended in obtaining and developing the information.

{¶24} NOACA quantifies the cost of staff time in compiling and creating the information submitted for the Amazon bid as approximately $15,000. (Gallucci Aff. at ¶ 25.) NOACA does not further break out the costs within this total. Based on NOACA's pleadings and affidavit, most if not all cost arose from data compilation, selection, and presentation, and not from obtaining or developing the site location or transit pass discount.

{¶25} The City of Cleveland presumably gave the location of the HQ2 site to NOACA, and NOACA provides no evidence to the contrary. The transit pass discount is expressed as a simple percentage, also presumably given to NOACA. The amount of effort or money expended by NOACA for this information was thus nil.

### (6) The amount of time and expense it would take for others to acquire and duplicate the information.

{¶26} NOACA makes no effort to quantify the time and expense it would take for others to acquire and duplicate the information. It offers only the conclusory statement that no other organization in the region could compile the same information "without significant and likely prohibitive time, effort and expense." (Response at 10; Gallucci Aff.

at ¶ 26-27, 35.) This conclusion is impliedly based on the cost for another agency to recreate NOACA's entire analytical system, which is not the test. As noted *supra*, identical or functionally identical data, statistics, and maps are readily available to the public, without reinventing NOACA's systems.

{¶27} Further, most of the information tailored for this specific bid will change over time, including statistics and available site locations. Both NOACA and future competitors will rely on different, updated information for future bids. Emphasis on relevant attributes, and incentives offered, will vary with the preferences of each business courted.

{¶28} Finally, as detailed below, any person may request that NOACA use its systems to provide them with the identical data, statistics, and maps used in the HQ2 document, by simply giving NOACA the same inquiry or parameters the systems are programmed for to produce that output.

**The Besser Factors do not Support a Finding of Trade Secret in this Case**

{¶29} NOACA relies on speculative and conclusory statements regarding the economic value of keeping the HQ2 information secret from the public. Notably lacking is any factual evidence or expert testimony to support these statements. *Besser II* at 402. NOACA cites no cases where factual transportation and logistical attributes have been held trade secret. In *In re Emily Opilo and the Morning Call v. Penn. Dept. of Comm. and Econ. Dev.*, No. AP 2018-0145, 2018 PA O.O.R.D. LEXIS 432, *20-26, a state agency released part of its Amazon HQ2 proposals, but asserted trade secret for the "incentive proposal" portion, noting that it had "invested heavily in the Proposals in terms of staff time and resources." *Id.* at *20-23. The agency claimed that disclosure would harm agency "economic development initiatives to draw business to the Commonwealth by forcing them to negotiate in public." *Id* at *23. In rejecting the claim of trade secret, the Pennsylvania Office of Open Records found the various assertions of harm speculative and conclusory, and that "[m]ost importantly, the Department does not

adequately address *how* other persons can obtain economic value from the Incentive Proposal's disclosure." (Emphasis sic.) *Id.*

{¶30} Review *in camera* fails to convince the special master that future competitor cities would accomplish any significant savings of time or expense by knowing the information, or its arrangement, in NOACA's HQ2 document. I find that respondent has provided no persuasive evidence as to how any of the information, including the transit pass discount or the site location "derives independent economic value, actual or potential, from not being generally known." As in *Besser II* at 402, there is no credible evidence that the information withheld would benefit NOACA in future transactions. Finally, far from making efforts to keep the component information secret, NOACA publishes almost all of it as identical or functionally identical data, statistics, and maps online. I conclude that NOACA fails to show that any part of the HQ2 document falls squarely within the definition of trade secret.

### Requester is Entitled to the Same Data, Statistics, and Maps, Under the Database Rule

{¶31} Any person may obtain any requested output of NOACA's database systems, in any format, style, date range, data range, or other parameter that the software is programmed to produce. If a computer is already programmed to produce requested output, the output is deemed to already exist for the purposes of a R.C. 149.43 request. *State ex rel. Scanlon v. Deters,* 45 Ohio St.3d 376, 379, 544 N.E.2d 680 (1989), overruled on other grounds by *State ex rel. Steckman v. Jackson,* 70 Ohio St.3d 420, 426-427, 639 N.E.2d 83 (1994). *See State ex rel. Kerner v. State Teachers Retirement Bd.*, 82 Ohio St.3d 273, 274-275, 695 N.E.2d 256 (1998). For example, where a county recorder possessed an electronic database capable of compiling deeds, photographs, and other data into specific tax maps based on the operator's search criteria, that output was held to be available to any public records requester on demand. *State ex rel. Gambill v. Opperman,* 135 Ohio St.3d 298, 2013-Ohio-761, 986 N.E.2d 931, ¶ 4, 12, 16, 32-35. The Court found that the requester "may obtain paper copies of

maps and aerial photographs of properties in Scioto County by inputting search terms into the computer at the engineer's office and paying the cost for each document printed." *Id.* at ¶ 16.

{¶32} The courts have rejected other efforts to deny the public the value of already-compiled and computerized public records. In *State ex rel. Margolius v. Cleveland*, 62 Ohio St.3d 456, 584 N.E.2d 665 (1992), the Court found that the city could not restrict the requester to a paper printout, but must provide an electronic copy of the data compilation. Members of the public should not have to forfeit the value added to records by their manner of storage and organization. *Id.* at 459-460. As the Fourth District Court of Appeals summarized:

> The basic tenet of *Margolius* is that a person does not come - like a serf - hat in hand, seeking permission of the lord to have access to public records. Access to public records is a matter of right. The question in this case is not so much whether the medium should be hard copy of [sic] diskette. Rather, the question is: Can a government agency, which is obligated by law to supply public records, impede those who oppose its policies by denying the value-added benefit of computerization?

> The Ohio Supreme Court answered this question first in *State ex rel. Cincinnati Post v. Schweikert* (1988), 38 Ohio St.3d 170, 173-174, 527 N.E.2d 1230, 1233, when it held:

> "The law does not require members of the public to exhaust their energy and ingenuity to gather information which is already compiled and organized in a document created by public officials at public expense."

> The *Margolius* court further stated, in following its holding in *Cincinnati Post*:

> "Similarly, a public agency should not be permitted to require the public to exhaust massive amounts of time and resources in order to replicate the value added to the public records through the creation and storage on tape of a data base containing such records." *Margolius, supra*, 62 Ohio St.3d at 460, 584 N.E.2d at 669.

*State ex rel. Athens County Property Owners Assn. v. Athens*, 85 Ohio App.3d 129, 131, 619 N.E.2d 437 (4th Dist.1992).

{¶33} The common thread in these cases is the obligation to pass on the full utility of a public record to the public. The evidence shows that the data, statistics, and maps for the HQ2 document were compiled with public monies, on equipment purchased with public monies, using software licensed with public monies, by employees paid with public monies. (Gallucci Aff. at ¶ 6, 20.) The public should not be denied the value that it has paid for in the resulting record, or forced to go to needless expense to replicate it. Respondent states that NOACA's forecasting model and GIS systems are already programmed with data and capabilities to illustrate stored data in many ways, including the use of data layers, aggregation of information from the 5-county planning area, and maps. (Gallucci Aff. at ¶ 10-14.) Under the holdings in *Gambill* and *Margolius*, a requester is entitled to any output that NOACA's computers are programmed to produce.

**Conclusion**

{¶34} Upon consideration of the pleadings and attachments, I find respondent has failed to show that any information in the HQ2 document constitutes trade secret. Accordingly, I recommend that the court ORDER respondent to provide Naymik with an unredacted copy of the requested record as submitted under seal. I further recommend that Naymik be entitled to recover the amount of the filing fee and any other costs associated with the action that he has incurred. R.C. 2743.75(F)(3)(b).

{¶35} *Pursuant to R.C. 2743.75(F)(2), either party may file a written objection with the clerk of the Court of Claims of Ohio within seven (7) business days after receiving this report and recommendation. Any objection shall be specific and state with particularity all grounds for the objection. A party shall not assign as error on appeal the court's adoption of any factual findings or legal conclusions in this report and recommendation unless a timely objection was filed thereto. R.C. 2743.75(G)(1).*

Case No. 2017-00919PQ          -17-     REPORT AND RECOMMENDATION

_____

JEFFERY W. CLARK
Special Master

**Filed April 27, 2018**
**Sent to S.C. Reporter 5/4/18**