[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 374.]

THE STATE EX REL. CINCINNATI ENQUIRER *v.* HAMILTON COUNTY, OHIO.

THE STATE EX REL. CINCINNATI ENQUIRER *v.* CINCINNATI.

THE STATE EX REL. CINCINNATI POST *v.* HAMILTON COUNTY, OHIO.

THE STATE EX REL. CINCINNATI POST *v.* CINCINNATI.

[Cite as *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 1996-Ohio-214]

*Mandamus to compel Hamilton County and the city of Cincinnati to provide copies of audio tapes of various "911" emergency calls in their custody— Writs granted.*

(Nos. 95-675, 95-677, 95-686 and 95-843—Submitted December 12, 1995— Decided March 6, 1996.)

IN MANDAMUS.

———————————

{¶ 1} These are four cases in which relators, the Cincinnati Enquirer and the Cincinnati Post, seek writs of mandamus compelling respondents, Hamilton County and the city of Cincinnati, to provide copies of audiotapes of various "911" emergency calls in their custody.

*Case Nos. 95-675 and 95-686*

{¶ 2} On October 21, 1994, Charles Orr, a former high school football star, allegedly beat his wife to death. The Forest Park Police Department was dispatched to the Orr residence in response to 911 emergency calls placed to the Hamilton County Communications Center ("HCCC"). HCCC provides 911 service under a contractual agreement with a number of municipalities in Hamilton County, including Forest Park. On October 22, 1994, a reporter for the Enquirer requested that the Forest Park police provide him access to the tapes of the Orr 911 calls. The reporter was referred to the Hamilton County Prosecuting Attorney, who had possession of the tapes. When the Enquirer and the Post requested a copy or

transcript of the Orr 911 tapes from the prosecutor, the tapes had been subpoenaed by the grand jury. The prosecutor refused relators' requests for the tapes or transcripts of the tapes.

{¶ 3} The tapes were presented to the grand jury, and the grand jury returned an indictment charging Orr with murder. During discovery in Orr's criminal case, the prosecutor's office provided transcripts of the requested 911 tapes to Orr's criminal defense counsel. The prosecutor's office intended to use the 911 tapes in evidence at Orr's criminal trial.

{¶ 4} Relators brought these mandamus actions to compel Hamilton County to either release copies of the Orr 911 tapes or provide relators with the opportunity to listen to the tapes. Some time thereafter, Orr's criminal trial proceeded, and the tapes relating to the 911 calls were apparently introduced into evidence. Orr was convicted of murder and sentenced to fifteen years to life.

*Case Nos. 95-677 and 95-843*

{¶ 5} On October 27, 1994, Carolyn E. Jones was murdered in the driveway between her back door and garage. On February 10, 1995, Leon Lumpkin was found dead on his living room floor. On February 26, 1995, Arnold Scott was shot in the head in the hallway of an apartment building. Scott died of the gunshot wound on March 5.

{¶ 6} The Cincinnati Police Department was dispatched to each murder scene following 911 calls made to the Cincinnati Police Communications Center ("CPCC"). CPCC receives 911 calls from Cincinnati and dispatches the appropriate emergency personnel. Although it is a division of the Cincinnati police, its 911 operators are not police investigators. The original Jones 911 tape was taped over in accordance with the city's normal policy of reusing the tapes. However, prior to the tape's being "erased," the homicide unit of the Cincinnati Police Division made a copy, which it retains. The city rejected the Enquirer's request for access to the Jones 911 tape and also rejected the Post's request for access to the

Jones, Lumpkin, and Scott 911 tapes. No criminal charges have been filed against any individual in connection with the Jones, Lumpkin or Scott murders. Relators instituted these mandamus actions to compel Cincinnati to provide access to the requested tapes.

{¶ 7} We issued an alternative writ and consolidated these four cases for purposes of decision. The cause is now before the court upon the evidence and briefs submitted by the parties.

———————————

*Keating, Muething & Klekamp*, *Richard L. Creighton, Jr.* and *Michael L. Scheier*, for relator in case Nos. 95-675 and 95-677.

*Baker & Hosetetler*, *David L. Marburger, Hilary W. Rule* and *Bruce W. Sanford*, for relator in case Nos. 95-686 and 95-843.

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *William E. Breyer*, Assistant Prosecuting Attorney, for respondent in case Nos. 95-675 and 95-686.

*Fay D. Dupuis*, Cincinnati City Solicitor, and *Karl P. Kadon*, Deputy City Solicitor, for respondent in case Nos. 95-677 and 95-843.

———————————

*Per Curiam.*

{¶ 8} These cases involve the disclosure of 911 tapes under Ohio's Public Records Act, R.C. 149.43. For the reasons that follow, we hold that 911 tapes in general, as well as the particular 911 tapes requested in these cases, are public records which are not exempt from disclosure.

{¶ 9} Mandamus is the appropriate remedy to compel compliance with R.C. 149.43. *State ex rel. Multimedia, Inc. v. Snowden* (1995), 72 Ohio St.3d 141, 142, 647 N.E.2d 1374, 1377. R.C. 149.43 is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records. *State ex*

*rel. Thomas v. Ohio State Univ.* (1994), 71 Ohio St.3d 245, 246, 643 N.E.2d 126, 128.

{¶ 10} Nine-one-one tapes are "records" for purposes of R.C. 149.43, and they are held by Hamilton County and Cincinnati, which constitute "public offices" under the Act. R.C. 149.43(A)(1); R.C. 149.011(A) and (G); *Thomas, supra*, 71 Ohio St.3d at 246-247, 643 N.E.2d at 128; *State ex rel. Margolius v. Cleveland* (1992), 62 Ohio St.3d 456, 461, 584 N.E.2d 665, 670 (public record may be in the form of paper, videotape, magnetic tape, or magnetic disk).[1]

{¶ 11} Respondents assert that the requested records are excepted from disclosure under R.C. 149.43(A)(1) and (A)(2). Hamilton County also asserts that its records are excepted under R.C. 149.43(A)(4). Exceptions to disclosure must be strictly construed against the custodian of public records, and the burden to establish an exception is on the custodian. *State ex rel. James v. Ohio State Univ.* (1994), 70 Ohio St.3d 168, 169, 637 N.E.2d 911, 912. With the foregoing general standards in mind, we turn to the specific claims of the parties.

*Case Nos. 95-675 and 95-686*

{¶ 12} Both of these cases involve the Orr 911 tapes. Transcripts of the tapes were submitted to the court under seal by Hamilton County. During Orr's criminal trial, the tapes relating to the 911 calls were apparently introduced into evidence. In that the disputed records have now been publicly revealed, relators are entitled to the requested writs of mandamus. *State ex rel. Newton v. Court of Claims* (1995), 73 Ohio St.3d 553, 557, 653 N.E.2d 366, 370, quoting *Oregon v. Dansack* (1993), 68 Ohio St.3d 1, 4, 623 N.E.2d 20, 22 ("[I]n mandamus actions *** 'a court is not limited to considering facts and circumstances at the time a proceeding is instituted, but should consider the facts and conditions at the time it determines whether to issue a peremptory writ.'").

---

1. Respondents do not contend that 911 tapes are not subject to disclosure because of their audiotape format.

**{¶ 13}** However, given the importance of the issues raised and the county's continuing practice of withholding from the public 911 tapes which initiate criminal investigations, we proceed to determine if Hamilton County properly rejected relators' requests for the records at the time the county refused disclosure. See, *e.g.*, *State ex rel. Fenley v. Kyger* (1995), 72 Ohio St.3d 164, 165, 648 N.E.2d 493, 494.

**{¶ 14}** The Enquirer initially asserts that 911 tapes are public records which are subject to immediate release upon request, since no exception to disclosure is ever applicable. Hamilton County counters, and the Enquirer's fellow relator, the Post, agrees,[2] that 911 tapes are limitless in possible content and could conceivably contain information protected from disclosure under some exception.

**{¶ 15}** Basic 911 systems, including the ones used by HCCC and CPCC, are systems "in which a caller provides information on the nature of and location of an emergency, and the personnel receiving the call must determine the appropriate emergency service provider to respond at that location." R.C. 4931.40(B). For example, HCCC automatically records 911 calls, which do not include the personal opinions of its employees. HCCC employees do not act under the direction of the county prosecutor or law enforcement officials when receiving and responding to 911 calls. HCCC employees are not employees of any law enforcement agency and are not trained in criminal investigation. The HCCC 911 operators simply compile information and do not investigate. The 911 tapes are not made in order to preserve evidence for criminal prosecution. Nine-one-one calls that are received by HCCC are always initiated by the callers. According to CPCC Senior Police Sergeant Schrand, a 911 call involving criminal conduct is

---

2. The Post states that "unless respondent proves that a tape of a 911 call satisfies the statutory criteria for exemption from mandatory public access, the tape must be disclosed." In addition, the Post "does not dispute that, under appropriate circumstances, a criminal defendant's right to a fair trail overrides a public office's statutory duty to provide public access to records under R.C. 149.43."

essentially a citizen's initial report of the criminal incident, which could typically trigger a police investigation.

{¶ 16} From the foregoing, it is evident that 911 tapes are not prepared by attorneys or other law enforcement officials. Instead, 911 calls are routinely recorded without any specific investigatory purpose in mind. There is no expectation of privacy when a person makes a 911 call. Instead, there is an expectation that the information provided will be recorded and disclosed to the public. Moreover, because 911 calls generally precede offense or incident form reports completed by the police, they are even further removed from the initiation of the criminal investigation than the form reports themselves.

{¶ 17} The moment the tapes were made as a result of the calls (in these cases—and in all other 911 call cases) to the 911 number, the tapes because public records. Obviously, at the time the tapes were made, they were not "confidential law enforcement investigatory records" (no investigation was underway), they were not "trial preparation records" (no trial was contemplated or underway), and neither state nor federal law prohibited their release. Thus, any inquiry as to the release of records should have been immediately at an end, and the tapes should have been, and should now and henceforth always be, released.

{¶ 18} The particular content of the 911 tapes is irrelevant. Therefore, it does not matter that release of the tapes might reveal the identity of an uncharged suspect or contain information which, if disclosed, would endanger the life or physical safety of a witness. Cf. R.C. 149.43(A)(1), 149.43(A)(2)(a) and (d). Further, although less likely to occur, it makes no difference that the disclosure of the tapes might reveal Social Security Numbers or trade secrets. Cf. *State ex rel. Beacon Journal Publishing Co. v. Akron* (1994), 70 Ohio St.3d 605, 640 N.E.2d 164; *State ex rel. Seballos v. School Emp. Retirement Sys.* (1994), 70 Ohio St.3d 667, 640 N.E.2d 829.

**{¶ 19}** In addition, the fact that the tapes in question subsequently came into the possession and/or control of a prosecutor, other law enforcement officials, or even the grand jury has no significance. Once clothed with the public records cloak, the records cannot be defrocked of their status. See *State ex rel. Carpenter v. Tubbs Jones* (1995), 72 Ohio St.3d 579, 580, 651 N.E.2d 993, 994 ("[N]on-exempt records do not become 'trial preparation records' simply because they are contained within a prosecutor's file"); but, cf., *John Doe Agency v. John Doe Corp.* (1989), 493 U.S. 146, 110 S.Ct. 471, 107 L.Ed.2d 462 (for purposes of federal Freedom of Information Act ("FOIA"), exemption from disclosure for records "compiled for law enforcement purposes" held to apply to documents originally collected for non-law-enforcement purposes but later "recompiled" with law enforcement purpose); KTVY-TV v. United States (C.A.10, 1990), 919 F.2d 1465, 1469 ("The FOIA does not require that records must have been originally compiled for a law enforcement investigation; the records merely must have been so compiled when the government invokes an exemption to the FOIA request.").

**{¶ 20}** Accordingly, we reject the case-by-case approach advocated by Hamilton County and the Post, and adopt the *per se* rule asserted by the Enquirer. Nine-one-one tapes in general, and these 911 tapes in particular, are public records which are not exempt from disclosure and must be immediately released upon request. Our holding appears to be consistent with the holdings reached by other jurisdictions. See *State v.* Cain (1992), 223 Conn. 731, 741, 613 A.2d 804, 809 ("Since tape recordings of 911 calls are public records, they are subject to the regulations regarding preservation and disposition of such records promulgated by the public records administrator * * *."); *State v. Gray* (Mo.App.1987), 741 S.W.2d 35, 38 (911 tape was a public record); cf. *Payne v. Grand Rapids Police Chief* (1989), 178 Mich.App. 193, 443 N.W.2d 481 (court, although not adopting any *per se* rule, held that conclusory allegations that disclosure of tape recordings of

emergency calls might have a chilling effect on citizen calls were insufficient to deny access to tapes under Michigan Freedom of Information Act).

{¶ 21} The requested Orr 911 tapes are not exempted from disclosure by any of the exceptions asserted by Hamilton County. Hamilton County erred in rejecting relators' requests for release of the Orr 911 tapes and transcripts under R.C. 149.43.

*Case Nos. 95-677 and 95-843*

{¶ 22} In these cases, the city of Cincinnati denied the Enquirer's request for access to the Jones 911 tape and the Post's request for access to the Jones, Lumpkin, and Scott tapes. As discussed above, we adopt the Enquirer's contention that all 911 tapes are subject to immediate release upon request. Therefore, it is unnecessary to consider the various exceptions to disclosure raised by Cincinnati.

*Disposition*

{¶ 23} Based on the foregoing, in case Nos. 95-675 and 95-686, we grant relators writs of mandamus compelling disclosure of the Orr 911 tapes and transcripts. In case No. 95-677, we grant the Enquirer a writ of mandamus compelling disclosure of the Jones 911 tape. In case No. 95-843, we grant the Post a writ of mandamus compelling disclosure of the Jones, Lumpkin, and Scott 911 tapes. Relators have additionally established a sufficient public benefit, and respondents failed to comply with the records requests for invalid reasons. Accordingly, relators are entitled to attorney fees. *Multimedia, supra*, 72 Ohio St.3d at 145, 647 N.E.2d at 1379. Relators' counsel are instructed to submit bills and documentation in support of their requests for attorney fees, in accordance with the guidelines in DR 2-106.

*Writs granted.*

MOYER, C.J., WRIGHT, RESNICK and COOK, JJ., concur.

DOUGLAS, J., concurs in judgment only.

F.E. SWEENEY, J., concurs in judgment only.

PFEIFER, J., concurs separately.

—————————————

**DOUGLAS, J., concurring in judgment only.**

{¶ 24} Case No. 95-675 (*State ex rel. Cincinnati Enquirer v. Hamilton County, Ohio*) was filed in this court on April 5, 1995. Case No. 95-677 (*State ex rel. Cincinnati Enquirer v. Cincinnati*) was filed in this court on April 5, 1995. Case No. 95-686 (*State ex rel. Cincinnati Post v. Hamilton County, Ohio*) was filed in this court on April 6, 1995. Case No. 95-843 (*State ex rel. Cincinnati Post v. Cincinnati*) was filed in this court on April 27, 1995. Each of these cases seeks the release of copies of audiotapes of various "911" emergency calls. Nearly eleven months later, the relators are now finally getting their answers. This time delay is, of course, too long, especially when such records lose some, most, or all of their newsworthiness with the passage of time. In fact, case Nos. 95-675 and 95-686 involve two 911 calls and tapes made in connection with one Charles Orr, who, subsequent to the calls in question, was indicted for the murder of his wife. During discovery in Orr's criminal case, the prosecutor's office provided transcriptions of the 911 tapes to Orr's defense counsel. Apparently the tapes were introduced as evidence at the criminal trial. Orr was convicted of murder and sentenced to fifteen years to life. All of this, and still relators were not given the tapes or an answer from this court until now, as to their entitlement to the tapes. We have to do better.

{¶ 25} Accordingly, I concur with the judgment of the majority, including the award of attorney fees. As I pointed out in my concurrence in *State ex rel. Plain Dealer Publishing Co. v. Cleveland* (1996), 75 Ohio St.3d 31, 39, 661 N.E.2d 187, 193, when we enforce the law (R.C. 149.43) as it is written, with regard to the awarding of attorney fees in these public record cases, we will see a drastic reduction of the number of open records cases coming before this and other courts.

—————————————

**PFEIFER, J., concurring.**

{¶ 26} I reluctantly agree with the majority's analysis of the law in this case, but I cannot agree with the law. The General Assembly needs to carefully examine whether audiotapes of 911 calls should be subject to public dissemination. Public records laws exist so that government may be open to the scrutiny of the citizenry. To accomplish that goal is it necessary for families to have their most tragic and personal moments broadcast for all to hear? Does a personal tragedy become a public spectacle simply because a person phones the police for aid? Are the media unable to relate effectively the story of a crime or accident without playing a recording of a victim's or a witness's plea for help? Have the rights of victims become subverted by our society's seemingly boundless morbid curiosity, transforming a moment of despair into a Warholian fifteen minutes?

{¶ 27} While the quavering voice of a four-year-old pleading with a 911 operator to make daddy stop hitting mommy may be some station manager's idea of "good television," the broadcast of that voice is not the product of good law. I urge the General Assembly to revisit this area.

_____