**[Cite as *Sutelan v. Ohio State Univ.*, 2019-Ohio-3675.]**

| | |
|---|---|
| EDWARD M. SUTELAN | Case No. 2019-00250PQ |
| Requester | Special Master Jeffery W. Clark |
| v. | <u>REPORT AND RECOMMENDATION</u> |
| OHIO STATE UNIVERSITY | |
| Respondent | |

### Ohio's Public Records Act

{¶1} "'The Public Records Act serves a laudable purpose by ensuring that governmental functions are not conducted behind a shroud of secrecy.'" *State ex rel. ESPN, Inc. v. Ohio State Univ.*, 132 Ohio St.3d 212, 2012-Ohio-2690, 970 N.E.2d 939, ¶ 40 (investigation of football players and coaches), quoting *State ex rel. Wallace v. State Med. Bd. of Ohio*, 89 Ohio St.3d 431, 438, 732 N.E.2d 960 (2000). "[P]ublic scrutiny is necessary to enable the ordinary citizen to evaluate the workings of his or her government and to hold government accountable." *White v. Clinton Cty. Bd. of Commrs.*, 76 Ohio St.3d 416, 420, 667 N.E.2d 1223 (1996). These purposes apply equally to police records:

> Lest there be any doubt about the legislature's intent regarding the public records status of police records generally, it must be observed that the legislature amended the public records law in response to the decision of the Supreme Court in *Wooster Republican Printing Co. v. Wooster* (1978), 56 Ohio St.2d 126, 10 O.O.3d 312, 383 N.E.2d 124. In *Wooster*, the court had held that police and other law enforcement investigatory records are not subject to compulsory disclosure under R.C. 149.43. *Id.* at paragraph four of the syllabus. In apparent response to that holding, the General Assembly amended the law to state expressly that law enforcement investigatory records are, subject only to narrow exceptions, within the compulsory disclosure provisions.

*State ex rel. Toledo Blade Co. v. Telb*, 50 Ohio Misc.2d 1, 4, 552 N.E.2d 243 (C.P.1990), fn. 3. *Accord State ex rel. Beacon Journal Publishing Co. v. Univ. of Akron*, 64 Ohio St.2d 392, 393-94, 415 N.E.2d 310 (1980) (routine incident report of alleged rape of student is not subject to statutory exception).

{¶2} The Public Records Act provides that upon request, a public office "shall make copies of the requested public record available to the requester at cost and within a reasonable period of time." R.C. 149.43(B)(1). Ohio courts construe the Public Records Act liberally in favor of broad access, with any doubt resolved in favor of disclosure of public records. *State ex rel. Hogan Lovells U.S., L.L.P. v. Dept. of Rehab. & Corr.*, 156 Ohio St.3d 56, 2018-Ohio-5133, 123 N.E.3d 928, ¶ 12.

{¶3} R.C. 2743.75 provides "an expeditious and economical procedure" to resolve public records disputes in the Court of Claims. A claim to enforce the Public Records Act through R.C. 2743.75 must be established by clear and convincing evidence. *Hurt v. Liberty Twp.*, 2017-Ohio-7820, 97 N.E.3d 1153, ¶ 27-30 (5th Dist.). However, if the public office asserts that an exception applies, "[e]xceptions to disclosure under the Public Records Act, R.C. 149.43, are strictly construed against the public-records custodian, and the custodian has the burden to establish the applicability of an exception. A custodian does not meet this burden if it has not proven that the requested records fall squarely within the exception." *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, paragraph two of the syllabus. Any doubt as to an exception should be resolved in favor of disclosure. *State ex rel. James v. Ohio State Univ.*, 70 Ohio St.3d 168, 169, 637 N.E.2d 911 (1994).

**Public Records Request**

{¶4} On September 26, 2018, requester Edward Sutelan made a request to respondent Ohio State University (OSU) for "all police reports, officer narratives, and witness narratives" involving listed football players for a seven-year period. (Response, Exh. A at 0001-0003.) OSU initially objected to the request as overly broad, but then

accepted without objection Sutelan's revised request for a shorter period. (Response at 3; Exh. B at 0005.) On February 4, 2019, OSU provided Sutelan with some of the requested records, including a redacted two-page report titled "Case P2018-04287 – UNAPPROVED DRAFT." (Complaint at 2-3.) OSU explained the redactions relevant to this report by stating that "[p]ersonal identifying information of uncharged suspects has been redacted pursuant to R.C. 149.43(A)(1)(h) and (A)(2)(a)." (*Id.* at 4.) On February 27, 2019, Sutelan responded,

> I have been told that even uncharged suspects cannot have their names redacted in initial police reports, and I intend to challenge that since this report I have has names redacted.

(Response, Exh. C at 0010.) Sutelan also objected to the time taken to provide the redacted report, stating "It has been several weeks now," and

> [i]t is a single police report and while I understand you all have a lot of records to process, this one has taken what I believe to be a considerable amount of time to process.

(*Id.*) OSU replied, "We continue to process your request." (*Id.*)

{¶5} On February 27, 2019, Sutelan filed a complaint pursuant to R.C. 2743.75 alleging denial of access to public records in violation of R.C. 149.43(B). His claim for production was "requesting the name of the offender be unredacted." (Complaint at 1; Clarification on Complaint.) Following unsuccessful mediation, OSU filed a combined brief and motion to dismiss (Response) on April 24, 2019. On May 23, 2019, OSU filed a supplemental response including a suggestion of mootness. On June 7, 2019, Sutelan filed a reply. On June 27, 2019, OSU filed a second supplemental response and filed an unredacted copy of the withheld records under seal.

{¶6} The evidence in this case shows that the OSU Police Division (OSUPD) created an incident report at the outset of criminal Case P2018-04287. The incident report was required by and detailed in OSUPD's General Orders and records management system guide. OSUPD incident reports are required to reflect available

information regarding suspects, and this report did reflect the name of the suspect. The public records exception that OSU relied on to withhold the name of the uncharged suspect for eight months did not apply to this incident report. OSU thus denied Sutelan access to a public record in violation of R.C. 149.43(B)(1). Although OSU disclosed the suspect's name during litigation, this action involves important issues capable of repetition yet evading review and is thus not moot.

### Background

{¶7} Sutelan's request for "all police reports" involving certain individuals is evaluated in the context of OSU's records management system. OSUPD General Order 82.2 requires the creation and prescribes the content of incident reports in criminal matters:

### 82.2 Incident Reporting and Management System

#### 82.2.1 Reports System

The Ohio State University Police Division maintains a computerized Records Management System (RMS) designed to assist the division in meeting its managerial, operational, and informational needs. Listed below are the guidelines for reporting, the system used in incident reporting, and the procedures for submitting, processing, and supervisory review of field reports.

(Respondent's Exh. H, p. 82-9.) The General Order provides that:

Incident Reports shall be required for the following:

> * * *

Any investigation of a crime as defined in the Ohio Revised Criminal Code

(*Id.*, p. 82-10.) OSU guarantees victims that the Police Division will take incident reports in cases of sexual assault:

If you believe you are the survivor of a sexual assault on campus, the University Police Division will guarantee you the following:

1. We will meet with you privately, at a place of your choice, to take a police incident report.

*OSU Department of Public Safety, Sexual Assault Reporting, The Ohio State University Survivor's Rights Guarantee*, https://dps.osu.edu/sexual-assault-reporting (accessed July 26, 2019).

**{¶8}** All OSUPD incident reports are generated and maintained through the Records Management System (RMS), utilizing RMS incident reports and supplemental forms to standardize the incident reporting system. (Respondent's Exh. H, p. 82-10 to 82-11.) With regard to the contents of an incident report:

> The thoroughness of the recorded information is dictated by the incident.
>
> All pertinent information, based upon the nature of the incident, is collected by the dispatcher and officers and recorded in the CAD and RMS.
>
> The reporting officer is required to obtain and enter as much subject information as possible. Although there may be circumstances where it is not possible to obtain some information, the minimum subject information should be:
>
> - [name, address, DOB, SSN, race, sex]

(*Id.*, p. 82-15.) Once an officer generates an incident report, an administrative lieutenant reviews the report for completeness and status, and determines whether the report needs investigative follow-up. (*Id.*, p. 82-11 to 82-12.)

**{¶9}** OSUPD utilizes public safety software called Zuercher as its current RMS for police incident reports. Zuercher allows officers to input data from the time they arrive on scene to the time the matter is closed. (Respondent's Exh. D, Rose Aff. at ¶ 4-5.) The Zuercher Suite Guide (Respondent's Exh. I) details data input in the incident report. The scope of data entry includes all substantive information fields found in the

Ohio Uniform Incident Report form[1] and OIBRS/NIBRS reports,[2] as well as additional fields. When an officer selects a criminal offense for an incident report using Zuercher's Add Offense feature (Respondent's Exh. G, Zuercher Suite TRAINING screen shots, p. 3), the next screens prompt the entry of name, identifiers, and involvement for each individual, including designation of any offender. (*Id.* at 4-10; *See* Exh. I at 7-15.) "Zuercher requires an 'Offender' for every offense." (Exh. I at 15.) Zuercher refers to the person writing the initial report as the "Primary Officer." (*Id.* at 3.) The Zuercher Suite Guide provides for a Primary Narrative as part of the initial report: "The primary narrative may be used by the initial reporting officer to record their observations, impressions and initial investigative actions." (*Id.* at 21.)

{¶10} An initial disposition code of "Investigation Pending" is used while the case is being investigated by the Primary Officer or other officer (not a detective), or if the case needs follow-up. (*Id.* at 3.) The disposition code is changed to "Forward to Investigations" to refer a case to the Columbus Campus Investigative Services Unit. (*Id.*) The initial incident report concludes with the following process:

> Once the Primary Officer is certain the information contained is correct and complete, the report needs to be "finished." The Primary Officer may finish areas individually "Finish" or all at once "Finish All". Once an officer clicks finish, they will no longer be able to delete or modify the areas that have been "finished." * * *
>
> After the appropriate supervisor reviews the report for completion, accuracy, and quality, the supervisor will click "Approve." The approval can be done by section, or can be done all at once "Approve All".

(*Id.* at 24.)

---

[1] Compare the entry fields provided in the Zuercher Suite Guide (Respondent's Exh. I) and Zuercher Suite TRAINING screen shots (Respondent's Exh. G), with those in the *Ohio Uniform Incident Report (UIR) Training Manual* (August 2011) http://ocjs.ohio.gov/oibrs/Forms/UIR_Training.pdf (accessed July 15, 2019).

[2] The Guide refers to NIBRS-required information and codes. The software provides a hyperlink to assist in correcting any NIBRS errors or omissions. (Respondent's Exh. I at 24 – NIBRS Validation.)

**Incident Report in Case No. P2018-04287**

{¶11} OSU provided the court with a complete copy of OSUPD Case No. 2018-04287, under seal. (Respondent's Exhibit E.)[3] The case begins with an incident report (Exh. E, Case P2018-04287), as required by General Order 82.2.1 at 82-10, using fields prescribed by the Zuercher Suite Guide, and as shown in the Zuercher Suite TRAINING screen shots. The Case Log shows that Primary Officer Regina Shoopman entered information into the incident report from 2:30 p.m. to 3:05 p.m. on September 13, 2018, during and immediately following her on-site interview with the Complainant/Initial Reporter. (Exh. E, Case Log at 1-2.) The initial incident entries by Officer Shoopman include the name of the suspected offender. (Exh. E, Case P2018-04287 at 2; Case Log at 2, 9/13/18 15:01.) The initial portion of the incident report concludes with Officer Shoopman's Primary Narrative, which also contains the name of the suspect. (*Id.*) Officer Shoopman coded and dated her report as "9/13/18 15:05 Case Finished," and Lieutenant Joanna Shaul then coded and dated the report as "9/13/18 17:30 Case Approved." (Exh. E, Case Log at 2.)

**Motion to Dismiss**

{¶12} In order to dismiss a complaint for failure to state a claim upon which relief can be granted, it must appear beyond doubt that the claimant can prove no set of facts warranting relief after all factual allegations of the complaint are presumed true and all reasonable inferences are made in claimant's favor. *State ex rel. Findlay Publishing Co. v. Schroeder*, 76 Ohio St.3d 580, 581, 669 N.E.2d 835 (1996). As long as there is a set of facts consistent with the complaint that would allow the claimant to recover, dismissal

---

[3] Exh. E is not paginated sequentially. This report will therefore reference the contents of Exh. E by the titles of the included documents, i.e.: Case P2018-04287; CFS-Command Log; Case Log; Disposition Log; Case Notes; Victim Form; Clery Report; Peirano, Molly M; Snead, Brian; Survivor 18-4287, Unknown; CFS-Unit Response Times; Primary Narrative; Supplemental Report by Bruce Allen; and Supplemental Report by David Ferimer, followed by the page number of the titled document.

for failure to state a claim is not proper. *State ex rel. V.K.B. v. Smith*, 138 Ohio St.3d 84, 2013-Ohio-5477, 3 N.E.3d 1184, ¶ 10.

{¶13} With respect to the claim that it improperly withheld access to an initial police incident report, OSU asserts that Sutelan cannot show a violation because "Mr. Sutelan did not seek and was not provided *any* 'initial police reports.'" (Emphasis *sic.*) (Response at 6.) OSU further asserts that it has now provided the sole record sought and the claim is thus moot. Sutelan agrees that the claim for production has been satisfied, but argues that the action is not moot because there exist important issues that are capable of repetition yet evading review. (Reply, *passim.*) Sutelan also complains that OSU's eventual production of the suspect's name was untimely – a separate violation of the Public Records Act.

### Sutelan's Request For "All Police Reports" Explicitly Included Any Incident Reports

{¶14} Sutelan's request for "*all* police reports, officer narratives, and witness narratives" could not be more inclusive as to the reports requested. The request clearly seeks all reports maintained by the police division – regardless of individual report titles. I find clear and convincing evidence that Sutelan's original request reasonably identified and sought all OSUPD police reports, including any initial police report. The complaint therefore states a claim for production of such reports.

{¶15} Moreover, the Supreme Court states that perfection is not required of public records requests, "particularly where, as here, it is evident that the public office was aware of the specific records requested." *State ex rel. Morgan v. New Lexington*, 112 Ohio St.3d 33, 2006-Ohio-6365, 857 N.E.2d 1208, ¶ 37. In *Morgan*, the City of New Lexington argued that the requester had not couched his request in the precise terminology recently adopted by the City. The City responded to a request for employee "personnel files" by stating that, as of the year before, "there were no specific 'personnel files' for municipal employees that were ever designated by New Lexington as such." *Id.* at ¶ 18. New Lexington argued that because it no longer designated any employee

records as "personnel files," Morgan had requested a record that did not exist. *Id*. at ¶ 56. The Court dismissed this semantic argument by observing that "records that are the functional equivalent of personnel files exist and are in the custody of the city," and granted the writ to produce the records. *Id* at ¶ 57, 59. OSU similarly argues that it does not designate the initial set of entries in its incident report as an initial incident report, but as "UNAPPROVED DRAFT," and that Sutelan therefore neither requested nor received an initial incident report. (Response at 5-6.) However, OSU admits that the UNAPPROVED DRAFT report "contains a full recitation of the OSUPD's work product as of" October 19, 2018 (Response at 5). On review, the UNAPPROVED DRAFT consists entirely of initial information entered into the OSUPD RMS incident report by the responding OSUPD officer on September 13, 2018. (Complaint at 2-3.) Thus, like the personnel files of New Lexington*,* an initial incident report may be observed in this OSUPD criminal case, or, at the very least, the functional equivalent thereof.

{¶16} In *State ex rel. O'Shea & Assocs. Co., L.P.A. v. Cuyahoga Metro. Hous. Auth.*, 131 Ohio St.3d 149, 2012-Ohio-115, 962 N.E.2d 297, at ¶ 21, the Court stated that "we must consider the propriety of a public records request 'in the context of the circumstances surrounding it,'" quoting *Morgan v. New Lexington, supra,* at ¶ 33. Here, as in *Morgan* and *O'Shea*, it is evident that OSU was aware through its General Orders and Zuercher Suite Guide of the titles and content of "all police reports" created by the police division. In the context of the circumstances surrounding his request, Sutelan's request for all police reports reasonably identified the standard incident report provided for in OSU's General Order 82 and the Zuercher Suite Guide, and as defined in *State ex rel. Beacon Journal Publishing Co. v. Maurer*, 91 Ohio St.3d 54, 741 N.E.2d 511 (2001). (*See* **Initial Incident Report Defined**, below.) An initial incident report therefore existed in fact, pursuant to OSUPD administrative rules, and such a report existed as a matter of law, pursuant to Supreme Court holdings.

{¶17} OSU states that the police division "does not *create* 'initial police reports' for its day-to-day functions" (Response at 6), as though an initial incident report does not exist for public record purposes until the agency prints or otherwise outputs the already compiled report. This proposition is without merit. The initial incident report is created upon entry of pre-investigation information onto a fixed electronic medium, whether or not it is printed out. Further, a requester is entitled to any electronically compiled record that the associated software is programmed to produce. *See generally Naymik v. Northeast Ohio Areawide Coordinating Agency*, Ct. of Cl. No. 2017-00919PQ, 2018-Ohio-1718, ¶ 31-33, and cases cited therein ("database rule"). OSUPD demonstrated by sending Sutelan the so-called UNAPPROVED DRAFT, which consisted of the initial entries in its incident report, that it can readily produce initial incident reports using existing programming. Whether OSU had previously printed this report, or maintained it only electronically, does not affect a non-media-specific request for "all reports." *See State ex rel. Cater v. N. Olmsted*, 69 Ohio St.3d 315, 320, 631 N.E.2d 1048 (1994) (a requester is not required to guess correctly the media format in which requested records are kept).

{¶18} Although "*all* police reports" is unambiguous, I further find that Sutelan specified the inclusion of initial incident reports as subjects of the request beyond misunderstanding when he objected to OSU that "uncharged suspects cannot have their names redacted *in initial police reports*, and I intend to challenge that since *this report I have* has names redacted." (Response at 3, Exh. C at 0010.)

{¶19} I find clear and convincing evidence that Sutelan's public records request for "all police reports" reasonably identified and sought any police incident reports regardless of title. The subordinate claim in the complaint for unredaction of the suspect's name from the record he received was based on Sutelan's reasonable belief that that document was the initial incident report.

**Suggestion of Mootness**

{¶20} In an action to enforce R.C. 149.43(B), a public office may produce the requested records prior to the court's decision and thereby render the claim for production moot. *State ex rel. Striker v. Smith*, 129 Ohio St.3d 168, 2011-Ohio-2878, 950 N.E.2d 952, ¶ 18-22. Three months after the complaint was filed, OSU provided Sutelan with the name of the uncharged suspect contained in the incident report. (Response, Exh. B at 0005; Supp. Response at 4.) Sutelan agrees that he has received the specific record he sought. (Reply at 2.) I find that Sutelan's claim for production of the name of the uncharged suspect has been rendered moot.

**Failure of Timely Production Precludes Mootness**

{¶21} In mandamus, courts will not find a public records action moot if an additional claim remains to be determined. *State ex rel. Cincinnati Enquirer v. Ronan*, 124 Ohio St.3d 17, 2009-Ohio-5947, 918 N.E.2d 515, ¶ 10 (attorney fees). Under the remedy provided by R.C. 2743.75, the Court of Claims may order recovery by the requester of his filing fee and any other costs associated with the action that were incurred, if it "determines that the public office * * * denied the aggrieved person access to the public records in violation of division (B) of section 149.43 of the Revised Code." R.C. 2743.75(F)(3)(b). The court also assigns court costs based in part on determination of violations. Assignment of these costs in response to a timeliness violation prevents a public office from escaping all liability through a calculated delay in compliance:

> If no fees could be awarded unless the court had ordered a party to produce records, it would allow a public office to sit on a public-records request until a mandamus case was filed and then turn over the records before the court had a chance to issue an order. It would thereby prevent a requester from obtaining records within a reasonable time, while the public office would escape liability for attorney fees altogether, ***

*State ex rel. DiFranco v. S. Euclid*, 138 Ohio St.3d 367, 2014-Ohio-538, 7 N.E.3d 1136, ¶ 42 (Kennedy, J., dissenting). In *DiFranco*, the majority denied attorney fees because

statutory language (since superseded) required an *order to comply* with the public records law, and not merely a finding of violation. *Id.* at ¶ 31-35. *See Cleveland Assn. of Rescue Employees/ILA, Local 1975 v. Cleveland*, 2018-Ohio-4602, 123 N.E.3d 374, ¶ 11 (8th Dist.).

{¶22} Unlike the attorney fee language considered in *DiFranco*, the Court of Claims fee and cost language in R.C. 2743.75(F)(3)(b) (*if the court determines the public office denied access to records in violation of R.C. 149.43(B)*) is analogous to statutory damages language in R.C. 149.43(C)(2) ("*if a court determines that the public office * * * failed to comply with an obligation in accordance with*" R.C. 149.43(B)), and therefore remains an actionable remedy. *DiFranco* at ¶ 19-21. *See State ex rel. Kesterton v. Kent State Univ.*, 156 Ohio St.3d 13, 2018-Ohio-5108, 123 N.E.3d 887, ¶ 15-22 (university violated R.C. 149.43(B) when it did not produce *all* responsive records until months after requester filed complaint in court). *Accord State ex rel. Kesterton v. Kent State Univ.*, 156 Ohio St.3d 22, 2018-Ohio-5110, 123 N.E.3d 895, ¶ 19-20, 31-32, 38.

{¶23} The Supreme Court cautions that "[t]he expense of litigation can chill the exercise of [the public's right to monitor the conduct of government]." *State ex rel. Rogers v. Dept. of Rehab. & Corr.*, 155 Ohio St.3d 545, 2018-Ohio-5111, 122 N.E.3d 1208, ¶ 31. The Court noted that the availability of compensatory (in *Rogers*, attorney) fees

> is a check on a public office's ability to inappropriately deny a public-records request and choose instead protracted litigation. Ohio's public-records law "reinforce[s] the understanding that open access to government papers is an integral entitlement of the people, to be preserved with vigilance and vigor." *Kish v. Akron*, 109 Ohio St.3d 162, 2006-Ohio-1244, 846 N.E.2d 811, ¶ 17.

*Id.* Thus, this case is not within the ambit of the general rule that provision of the requested public records renders the claim moot. *State ex rel. Wadd v. Cleveland*, 81 Ohio St.3d 50, 52, 689 N.E.2d 25 (1998).

**{¶24}** The impact of untimely production can be significant. "*When* records are available for public inspection and copying is often as important as *what* records are available." (Emphasis *sic*.) *Id. See also Looper v. Ohio State University*, Ct. of Cl. No. 2016-00778PQ (January 31, 2017). Timeliness is more often a significant issue for media requesters such as Sutelan, who at the time of the request was Editor-in-Chief of OSU's student newspaper, *The Lantern*. (Response at 2.) The impact on the public office of a determination and fees for a violation of timely production can also be significant. Even where an order to produce records is no longer necessary, determination of accompanying violations of R.C. 149.43(B) has the salutary effect of recognizing and sanctioning policies or practices that predictably result in delay.

**{¶25}** Sutelan challenged the timeliness of OSU's response in his correspondence (Response, Exh. C at 0010), and complained in a pleading that "[t]he university provided a copy of the unredacted police report fewer than 24 hours before it was required to submit such materials to the special master." (Reply at 2.) OSU delayed production of the suspect name in this case until eight months after the request was made, and three months after the complaint was filed. The Public Records Act requires a public office to provide requested copies "within a reasonable period of time." R.C. 149.43(B)(1). The duration of a "reasonable period of time" is evaluated based on the facts and circumstances of each case. *State ex rel. Shaughnessy v. Cleveland*, 149 Ohio St.3d 612, 2016-Ohio-8447, 76 N.E.3d 1171, ¶ 8-22. The timing required for production of an initial incident report is particularly short: "Routine offense and incident reports are subject to immediate release upon request." *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 639 N.E.2d 83 (1994), paragraph five of the syllabus. I find that OSU's delays in providing the report and the suspect's name were in excess of any "reasonable period of time," and well beyond "immediate release."

**Important Issues That Are Capable of Repetition Yet Evading Review**

{¶26} Sutelan separately asserts that in response to future requests, OSU will continue to redact uncharged suspect names from initial incident reports, substitute OSU's definition of "Initial Report" for the Supreme Court's definition of incident reports, and thereby delay required release. (Reply, *passim.*) OSU's pleadings confirm these predictions. OSU continues to maintain that it does not consider the "incident report" identified as such by its General Orders and RMS system to be an initial incident report. (Supp. Response at 5-6.) Equally important, OSU states that even in response to a specific request for an "*initial* police report." it will produce only an incomplete version, exemplified by Rose Aff. Exh. 1. (*Id.*; *See* Exh. D Rose Aff. at ¶ 6-7.) There is therefore every reason to believe OSU will apply the policies and practices it followed in this instance to future requests for police reports.

{¶27} The Supreme Court found important timing issues capable of repetition yet evading review in *Wadd*, *supra*. The City of Cleveland had previously provided access to accident reports within one day, but then commenced to delay access for up to twenty-four days. *Id.* at 53. Despite the eventual production of the records, the Court found that,

> This case raises the important issue of when public records must be prepared and made available to the public for inspection and copying. *When* records are available for public inspection and copying is often as important as *what* records are available.

(Emphasis *sic.*) *Id.* at 52. In *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 662 N.E.2d 334 (1996), the Court found that "given the importance of the issues raised and the county's continuing practice of withholding from the public 911 tapes which initiate criminal investigations, we proceed to determine if Hamilton County properly rejected relators' requests for the records at the time the county refused disclosure," despite release of the tapes during litigation. *Id.* at 377. Likewise, the Supreme Court proceeded to rule on required disclosure of pre-investigation records, belatedly provided, in *State ex rel. Cincinnati Enquirer v. Ohio Dept. of Pub. Safety*, 148

Ohio St.3d 433, 2016-Ohio-7987, 71 N.E.3d 258, ¶ 29-31 (dash-cam video of suspect pursuit), and *State ex rel. Cincinnati Enquirer v. Sage*, 142 Ohio St.3d 392, 2015-Ohio-974, 31 N.E.3d 616, ¶ 9, fn. 1 (tape of 9-1-1 "return call").

{¶28} OSU's denial of its obligation to produce a standard initial police report, based solely on its relabeling of the report as an "UNAPPROVED DRAFT," is important to future requesters seeking reports from OSUPD and other Ohio law enforcement agencies. The Supreme Court has "consistently construed the Public Records Act to provide the broadest access to government records." *State ex rel. Cincinnati Enquirer v. Winkler*, 101 Ohio St.3d 382, 2004-Ohio-1581, 805 N.E.2d 1094, ¶ 5. In related First Amendment analysis, the *Winkler* Court noted that "[t]he right of public access, as examined in the context of a criminal proceeding, serves several lofty goals. First, a crime is a public wrong, and the interest of the community to observe the administration of justice in such an instance is compelling." (Citation omitted.) *Id.* at ¶ 9. Because news media seek access to public records as a public watchdog, "the health and safety of this democracy depend on a press that can function without additional burdens being imposed based on its ability to publish information concerning government activities." *Kallstrom v. Columbus*, 165 F. Supp.2d 686, 703 (S.D. Ohio 2001). OSU's circumvention of the required immediate disclosure of initial incident reports imposes just such an additional burden. In this case, a student newspaper editor was denied the complete initial incident report of a serious crime that allegedly occurred on state university property, delaying release of a rape suspect's name for eight months. OSU could continue to circumvent future requests by withholding suspect information from all but those who file litigation, and then seeking dismissal of the litigation as moot prior to judicial determination. Failure to correct this policy and practice would create a perverse incentive for law enforcement agencies to litigate, wait, and belatedly disclose, if delay is the agency's objective. To deny Sutelan resolution of these issues "would permit persons responsible for public records to circumvent review of their practices by making

exceptions for those who object." *State ex rel. Fenley v. Ohio Historical Soc.*, 64 Ohio St.3d 509, 510, 597 N.E.2d 120 (1992). In pursuing his goal to challenge OSUPD's policy as non-compliant with the production and timeliness requirements of R.C. 149.43(B), Sutelan thus remains an "aggrieved" party for R.C. 149.43(C) purposes.

{¶29} Because OSU continues to maintain that the record at Complaint p. 2-3 is not the initial incident report defined by the Supreme Court that must be released immediately upon request, including the identity of any uncharged suspect therein, I conclude that this case is not moot. *State ex rel. Ohio Republican Party v. Fitzgerald*, 145 Ohio St.3d 92, 2015-Ohio-5056, 47 N.E.3d 124, ¶ 15-17 (despite release of data, case not moot because public office continued to maintain that the data was "not public records that must be released"). I find this to be an important issue that is not just capable of repetition, but highly likely to repeat for Sutelan, his colleagues, and his successors at *The Lantern*.

{¶30} Based on the above, I recommend that the court grant the motion to dismiss the claim for unredaction of the suspect's name as moot. I further recommend that the court deny the motion to dismiss as to the issue of timely production. I further recommend that the court deny the motion to dismiss as to the important issues in the case that are capable of repetition yet evading review.

**Exception Claimed**

{¶31} The confidential law enforcement investigatory records (CLEIRs) exceptions defined at R.C. 149.43(A)(2) apply to specific records within a law enforcement investigatory file. However, the wording of the statute clearly "indicates that the General Assembly sought to guard against these exceptions swallowing up the rule which makes public records available." *State ex rel. Beacon Journal Publishing Co. v. Univ. of Akron*, 64 Ohio St.2d 392, 415 N.E.2d 310 (1980). Accordingly, the Court has long held that "routine incident reports" and other routine factual reports are not covered by the CLEIRs exception. *Id.* at 397-98. Thus, although a CLEIRs exception exists for

records which would create a high probability of disclosure of the identity of an uncharged suspect, R.C. 149.43(A)(1)(h) and (A)(2)(a), the parties agree that initial police reports are not subject to this exception. (Response at 5.) *See State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 639 N.E.2d 83 (1994), paragraph five of the syllabus ("Routine offense and incident reports are subject to immediate release upon request"). "We rule this way despite the risk that the report may disclose the identity of an uncharged suspect." *State ex rel. Beacon Journal Publishing Co. v. Maurer*, 91 Ohio St.3d 54, 57, 741 N.E.2d 511 (2001). In *State ex rel. Rocker v. Guernsey Cty. Sheriff's Office*, 126 Ohio St.3d 224, 2010-Ohio-3288, 932 N.E.2d 327, ¶ 16, the Court affirmed strict construction of the uncharged suspect exception, with a duty to resolve any doubt in favor of access.

{¶32} However, OSU asserts that it was justified in withholding the name of the uncharged suspect in this instance because "the document that forms the basis of Mr. Sutelan's complaint is not [an initial police] report." (Response at 5.) Thus, the issue before the court is whether OSU was in possession of an initial police incident report, containing the name of the suspect, when Sutelan requested "all police reports" involving or naming the suspect.

### Initial Incident Report Defined

{¶33} Relevant case law describes "offense or incident reports"[4] as the initiating reports in which a law enforcement agency records information prior to the commencement of an "investigation." *See generally Gannett GP Media, Inc. v. Chillicothe Police Dept.*, Ct. of Cl. No. 2017-00886-PQ, 2018-Ohio-1552, ¶ 16-26, and cases cited therein. While there is no black-letter definition, the Supreme Court recognizes certain characteristics common to these reports. "Offense-and-incident

---

[4] Sutelan and OSU refer in their pleadings to the "initial police report." OSU asserts that "such reports are interchangeably referred to as 'initial reports', 'incident reports', and 'offense and incident reports'" in case law. (Response at 2, fn. 1.)

reports are form reports in which the law enforcement officer completing the form enters information in the spaces provided." *State ex rel. Lanham v. Smith*, 112 Ohio St.3d 527, 2007-Ohio-609, 861 N.E.2d 530, ¶ 13. "Offense and incident reports initiate criminal investigations but are not part of the investigation." *State ex rel. Rasul-Bey v. Onunwor*, 94 Ohio St.3d 119, 120, 760 N.E.2d 421 (2002), citing *Maurer* at 55-57. In *Maurer*, the officer utilized an Ohio Uniform Incident Report (UIR) form, *Id.* at 54, although law enforcement agencies increasingly utilize comparable electronic incident report forms. *See Gannett GP Media v. Chillicothe PD* at ¶ 19. Thus, the case law factors common to offense and incident reports are that they are 1) form reports,[5] 2) in which an officer enters information about an incident, 3) that initiates or may initiate an investigation.

**{¶34}** This court has applied the term "*initial* incident report" to the reports described in the above cases. *See, e.g.*, *Gannett GP Media v. Chillicothe PD at* ¶ 17-18; *Narciso v. Powell Police Dept.*, Ct. of Cl. No. 01195PQ, 2018-Ohio-4590, ¶ 19-21. The modifier "initial" reflects the Supreme Court's description of incident reports as *initiating* investigations, as well as the UIR Training Manual's description of Uniform Incident Report content as including "*preliminary* information regarding the incident."[6] This report and recommendation will use the label "initial incident report" to mean the pre-investigation, intake portion of an incident report, as distinguished from later portions of an extended incident report that are entered after the case is assigned to the investigation stage. *See, e.g.*, *Gannett GP Media v. Chillicothe PD* at ¶ 19-23; *Colahan*

---

[5] Non-form records that precede the investigation are also subject to immediate release, even if they identify an uncharged suspect. *E.g.*, 9-1-1 tapes, *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 378, 662 N.E.2d 334 (1996); typed witness narratives, *Maurer* at 54, 56; and, on a case-by-case basis, police dash-cam video. *State ex rel. Cincinnati Enquirer v. Ohio Dept. of Pub. Safety*, 148 Ohio St.3d 433, 2016-Ohio-7987, 71 N.E.3d 258, ¶ 44-50.

[6] *Ohio Uniform Incident Report (UIR) Training Manual* (August 2011) at p. 2, http://ocjs.ohio.gov/ oibrs/Forms/UIR_Training.pdf. (Accessed July 15, 2019.) The UIR is a publication of the Ohio Department of Public Safety, Office of Criminal Justice Services, and is designed to capture crime data for the Ohio Incident-Based Reporting System and the FBI National Incident-Based Reporting System. *Id.* at 1. The basic form appears in the Manual immediately following the Table of Contents.

*v. Worthington Police Dept.*, Ct. of Cl. No. 2018-00928PQ, 2018-Ohio-4593, ¶ 11-13, 15.

**Analysis**

{¶35} By every description established in *Steckman*, *Maurer*, and their progeny, the September 13, 2018 report labeled "UNAPPROVED DRAFT" was the initial incident report in OSUPD Case P2018-04287. The report was created on an electronic incident report form, by a police officer, who entered factual information regarding an incident, before the matter was forwarded to the investigative services unit. The report contained preliminary information regarding the incident, was completed by the first responding officer, included incident information corresponding to the Ohio Uniform Incident Report form, was a routine report required by OSU for this type of incident, and was completed at the point of initial receipt of information from the public. The report was coded "finished" and "approved" on the same day it was created. Based on form, chronology, content, and authorship, I find clear and convincing evidence that this document is the initial incident report in Case P2018-04287.

{¶36} OSU was obligated to release this initial incident report in response to the unambiguous request for "all police reports" involving the suspect. OSU's failure to produce the report immediately, and its failure to unredact the name of the suspect in the report for eight months, violated its duty under R.C. 149.43(B)(1) to provide access to requested public records "within a reasonable period of time."

{¶37} There is no dispute that the name of an uncharged suspect may not be redacted from an initial incident report. The evidence shows that the name of the uncharged suspect in this case was obtained during the initial interview of the responding officer with the reporting party, was entered into the incident report form on September 13, 2018, and existed in the initial incident report at the time of the request. Because the name was contained in an initial incident report to which the claimed exception does not apply, I find that OSU fails to meet its burden to prove that the

withheld name of the suspect fell squarely within the claimed exception. I conclude that OSU improperly withheld the name of the uncharged suspect from the initial incident report that it provided to Sutelan, in violation of R.C. 149.43(B).

**The Zuercher "Initial Report" is not the Complete Initial Incident Report Recognized by the Ohio Supreme Court**

{¶38} OSU asserts that *Maurer* does not apply to the incident report here because OSUPD did not specifically title it an "initial police report." (Response at 2, 5.) As noted previously, a public office may not deny the existence of a manifestly public record merely by un-naming or renaming it. *State ex rel. Morgan v. New Lexington*, 112 Ohio St.3d 33, 2006-Ohio-6365, 857 N.E.2d 1208, ¶ 18, 37, 56-59 (denied existence of "personnel files"). Indeed, OSU implicitly recognizes that initial police reports are defined by content and may be labeled with different titles. (Response at 2, fn. 1.) Regardless, the Supreme Court, and not each individual law enforcement agency, defines the law enforcement incident reports referenced in *Steckman*, *Maurer*, and their progeny.

{¶39} For the same reason, a public office may not substitute a partial, redacted, summary, or otherwise minimized document as though it were the complete version of the initial incident report. OSU directs the court's attention to a so-called "Initial Report" programmed in Zuercher as the only record it would produce in response to future requests for the "initial police report:"

> "Even if Mr. Sutelan *had* requested an "initial police report," the record that he would have been provided would not contain the same information as the record he attaches to his Complaint. A copy of what would have been produced in response to a request for an "initial police report" is attached as Ex. 1 to Ex. D, Aff. of David Rose, OSU_0014."

(Response at 6; Exh. D – Rose Aff. at ¶ 6-7.) The Zuercher "Initial Report" is a heavily truncated, and non-original,[7] version of the initial incident report in Case P2018-04287. (Rose Aff., Exh. 1.) The Zuercher "Initial Report" omits the incident report categories of Dispatch Information, Complainant, Offender, and Primary Narrative, all of which were entered in the initial report by the dispatcher who received the call[8] and by responding Officer Shoopman during her ensuing interview with the complainant. This is directly contrary to *Maurer*, where the Supreme Court held that a law enforcement agency cannot remove "the public records cloak" that attaches to information incorporated into an initial incident report. *Maurer* at 57. Law enforcement agencies ar*e* obligated to produce a complete initial incident report, without applying CLEIRs exceptions or arbitrarily removing content.

{¶40} OSU does not explain its reason for renaming the initial incident report as an UNAPPROVED DRAFT, offering no evidence beyond the title that the document was a "draft," or of what record it was the draft. OSU does not explain or identify any report entry as "unapproved." To the contrary, OSU logged entry times in the initial incident report beginning with "Incident Created" at 2:42 p.m., through the entry and approval of individual field entries, and concluded with the supervisor entry, "Case Approved" at 5:30 p.m. (Respondent's Exh. E, Case Log,) OSU admits that the UNAPPROVED DRAFT report "contains a full recitation of the OSUPD's work product as of" October 19, 2018. (Response at 5.) Nor would "draft" status affect the availability of the report. Contrary to OSU's statement that "it is not the University's practice to release

---

[7] At odds with the word "initial" in the title, the Status, Disposition, and Crime Log Disposition entries in the "Initial Report" are the final codes and dates from 2019, and not the entries as they existed on the date in 2018 when the incident report initiated the investigation phase. Compare Rose Aff. Exh. 1 with Complaint at 2-3. See Exh. E, Case Log at 2 for entry dates.

[8] The incident report was created at 2:24 p.m. by a Kelly Short (Exh. E, Case Log at 1), and the initiating Call For Service (CFS) was automatically logged at 2:12 p.m. (Case P2018-04287 at 1; Exh. I at 3 – "Reported At.") These administrative inputs were even further removed from the investigatory stage of the case than Officer Shoopman's initial incident report.

unapproved drafts," OSU is obliged to disclose drafts, approved or not. *State ex rel. Cincinnati Enquirer v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 20-21 (draft public records are not inherently confidential).

{**¶41**} OSU asks the court to "[n]ote, specifically, 'Case Comments' on p. 5 [of Exh. I, Zuercher Suite Guide], discussing what should be included an [sic] 'initial summary of the case.'" (Second Supp. Response at 2.) The referenced Case Comments instructions provide that "[i]n this space, the Primary Officer should complete an initial summary of the case. The summary should be no more than three sentences. The Summary will be released to the media immediately, so there should be no sensitive or valuable investigatory information in this field. * * * There should be no disposition information in this field." (Exh. I at 5.) The Guide offers examples of the desired "initial summary of the case," including, for the most serious incident, merely: "OSUPD Officers are investigating a death." (*Id.*) This policy is apparently offered to demonstrate OSU's intent to constrain the release of information from reported criminal incidents. The Supreme Court has admonished such attempts to avoid public records access. *See, e.g., State ex rel. Rea v. Ohio Dept. of Educ.*, 81 Ohio St.3d 527, 534, 692 N.E.2d 596 (1998) ("Once records are deemed public, and not subject to an applicable exception, a public office cannot subvert or avoid its duty to disclose such records through restrictive agreements"); *State ex rel. Long v. Council of Cardington*, 92 Ohio St.3d 54, 60-61, 748 N.E.2d 58 (2001) ("Respondents have circumvented these crucial rights by preparing and maintaining insufficient and inaccurate minutes").

{**¶42**} The Public Records Act requires a public office to facilitate access to the public records it keeps, not arrange its records systems to obstruct access: "To facilitate broader access to public records, a public office or the person responsible for public records shall organize and maintain public records in a manner that they can be made available for inspection or copying in accordance with division (B) of this section." R.C.

149.43(B)(2). OSU's proffered policies and practices instead disaggregate and obscure the existence of initial incident reports and their contents.

**Conclusion**

{¶43} Upon consideration of the pleadings, attachments, and records filed under seal, I recommend that the court grant respondent's motion for dismissal of the claim for production of the name of the uncharged suspect as moot. I further recommend that the court find that this case involves important issues that are capable of repetition yet evading review and is therefore not moot. I further recommend that the court find that respondent failed to provide the requested records within a reasonable period of time. I further recommend the court find that respondent denied production of the name of an uncharged suspect on the unfounded assertion that the requested police reports did not include an existing initial incident report. I recommend the court order that requester is entitled to recover from respondent the amount of the filing fee of twenty-five dollars and any other costs associated with the action that he has incurred.

{¶44} *Pursuant to R.C. 2743.75(F)(2), either party may file a written objection with the clerk of the Court of Claims of Ohio within seven (7) business days after receiving this report and recommendation. Any objection shall be specific and state with particularity all grounds for the objection. A party shall not assign as error on appeal the court's adoption of any factual findings or legal conclusions in this report and recommendation unless a timely objection was filed thereto. R.C. 2743.75(G)(1).*

 

 

JEFFERY W. CLARK
Special Master

**Filed August 9, 2019**
**Sent to S.C. Reporter 9/12/19**